**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 6, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

GLORIA PORTER,

      Defendant-Appellant.

No. 12-2048

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 2:10-CR-03404-RB-1)**

---

Brock Benjamin, Benjamin Law Firm, El Paso, Texas, for Defendant-Appellant.

Jennifer M. Rozzoni (Kenneth J. Gonzales, former United States Attorney, with her on the brief), Office of the United States Attorney, District of New Mexico, Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **HOLMES**, **HOLLOWAY**, and **MURPHY**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

Following a jury trial, Defendant-Appellant Gloria Porter was convicted of 105 counts of wire fraud, one count of mail fraud, and one count of identity theft. Ms. Porter appeals her convictions, claiming that the district court incorrectly

instructed the jury with respect to aggravated identity theft and that the evidence was insufficient to support her convictions for wire fraud and mail fraud. We **affirm** Ms. Porter's convictions.

I

The National Federation of Federal Employees ("NFFE") is an independent federal union that at material times represented approximately 115,000 federal workers across the country. In 1999, the NFFE affiliated with the International Association of Machinists ("IAM"). The NFFE is comprised of five councils, which in turn are made up of approximately two hundred "locals." Members of a local pay their dues by permitting money to be withdrawn electronically from their paychecks. The money is then transmitted to the NFFE national office. A portion of the dues are then rebated back to the councils. Councils provide rebates to locals to encourage them to enroll new members; they also provide limited reimbursements to locals for office-equipment purchases and for training expenditures. Money does not flow from locals to councils.

Ms. Porter joined the NFFE in 1992. She began working at White Sands Missile Range in New Mexico in 1999. Ms. Porter was a member of Local 2049 at White Sands and served as its president. She also served as secretary/treasurer of the Armed Material Command ("AMC") Council (one of the NFFE's five councils) and as national vice president of the NFFE. Ms. Porter was secretary/treasurer of the AMC Council from 2002 to 2008, and was the only

2

active signatory on the AMC Council's bank account. An ATM/debit card for the account was issued in her name as early as 2004.

The AMC Council used an audit committee to ensure that financial records were "kept in accordance with good financial procedures." Aplt. App. at 358 (Trial Tr., dated June 27–30, 2011). Locals and councils only made expenditures by check; those checks required two signatures. Expenditures had to be authorized by the executive board or, in the case of large expenses, by all of the locals comprising a council. Further, as of January 2, 2005, the IAM instituted a policy forbidding members from using debit and credit cards. The policy applied to the entire union, including locals.

On December 20, 2010, a federal grand jury sitting in New Mexico returned a 107-count indictment against Ms. Porter. *Id.* at 16–23 (Indictment, filed Dec. 20, 2010). The indictment charged Ms. Porter with 105 counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 1 through 105), one count of mail fraud in violation of 18 U.S.C. § 1341 (Count 106), and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A (Count 107). *Id.*

Ms. Porter was tried in the U.S. District Court for the District of New Mexico. At trial, the evidence revealed that starting in August 2004 and throughout her time as an NFFE officer, Ms. Porter created fraudulent bank statements on her computer and sent them to NFFE officers, while having the authentic bank statements sent to her home address. Ms. Porter continued to send

3

fraudulent bank statements to NFFE officers through 2008. In May 2008, Ms. Porter provided only the AMC Council's check register to an audit committee, despite being asked to provide bank statements, cancelled checks, and corresponding receipts or invoices. After several more delays, in August 2008, Ms. Porter mailed a packet of what was later determined to be fraudulent bank statements to the AMC Council's audit committee. Thereafter, the NFFE took away Ms. Porter's authority over the union's bank account, and, after both the NFFE and IAM conducted their own audits of their accounts, the matter was turned over to the United States Department of Labor ("DOL") for further investigation.

The Labor-Management Reporting and Disclosure Act of 1959 (the "Act"), Pub. L. No. 86-257, 73 Stat. 519 (codified as amended in scattered sections of 29 U.S.C.), covers all unions with private sector employees, federal employees, and postal service employees. The DOL's Office of Labor Management Standards ("OLMS") has enforcement authority regarding the Act. The Act requires unions to submit so-called "LM" reports to ensure fiscal and financial reporting. The DOL has a legal duty to collect and publish those reports. Of particular relevance to this case, LM-3 reports cover labor unions with receipts of between $10,000 and $250,000 per fiscal year. At trial, Exhibits 74 through 79 were admitted; these were LM reports filed with the DOL on behalf of the NFFE's AMC Council. In the ordinary course of business, the reports would be received and stamped by

4

the DOL's OLMS in Denver, Colorado, and then mailed to the DOL's national OLMS in Washington, D.C., where the reports would receive a second stamp.

Exhibit 79 is a report that was filed on behalf of the AMC Council for 2006. Ms. Porter's name and address appear on the front page of the document. In addition to Ms. Porter's signature, the report contains what appears to be the signature of Sandra Moilanen—then president of the AMC Council. Ms. Moilanen denied receiving or signing this report. Ms. Porter testified that she signed all of the LM reports presented at trial, and sent them off to someone else for additional signatures.

Christiane Abendroth, a DOL investigator, analyzed the financial statements from Wells Fargo Bank for the AMC Council and Local 2049 and summarized the financial losses to both entities. Ms. Abendroth's investigation revealed that the AMC Council received income of $151,276 between 2001 and 2008. A total of $7,925 was intended for Local 2049, but was diverted to the AMC Council's account. Additionally, $8,600 was transferred from the Local 2049 account to the AMC Council's account, even though funds were not supposed to flow from the locals to the councils. Ms. Porter allegedly raided the AMC Council's account in perpetrating her fraud.

Ms. Abendroth testified that she examined each purchase reflected on the AMC Council's bank statements and determined whether it was authorized or unauthorized. She confirmed that all of the purchases had been effected through

5

wire communications that crossed state lines, for purposes of the wire fraud charges. At trial, multiple witnesses who were associated with businesses that appeared as payees on the AMC Council's bank statements—including a beauty salon, a day spa, and a home-improvement store—testified that Ms. Porter made payments with the AMC Council's visa debit card. Indeed, according to the testimony, one item purchased with the debit card—a refrigerator from Lowe's, a home-improvement store—was delivered to Ms. Porter's home address.

At the close of trial, Ms. Porter moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 with respect to certain wire fraud counts—specifically, Counts 3–17, 20, 21, 26, 27, 28, 54, 55—and also with regard to the mail fraud count (Count 106) and the aggravated identity theft count (Count 107). The district court denied Ms. Porter's motion, and the jury returned guilty verdicts on all 107 counts of the indictment.

Ms. Porter raises two issues on appeal: first, whether the district court erred by instructing the jury that a signature is a "means of identification" for purposes of the aggravated identity theft offense; and second, whether the evidence was sufficient to support her convictions for mail fraud and wire fraud. We take up these issues in turn.

## II

The aggravated identity theft statute provides: "Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers,

6

possesses, or uses, without lawful authority, a *means of identification* of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."[1]  18 U.S.C. § 1028A(a)(1) (emphasis added).  The statutory phrase "means of identification" is defined in another provision, 18 U.S.C. § 1028(d)(7).

Ms. Porter claims that the district court erred in instructing the jury on the aggravated identity theft charge.  The jury instruction for aggravated identity theft read, in pertinent part: "A person's signature is a 'means of identification.'"  Aplt. App. at 47 (Jury Instruction No. 14, filed June 30, 2011).  Specifically, Ms. Porter argues that the word "signature" is not expressly mentioned in the statutory definition of "means of identification" found in § 1028(d)(7) and a signature should not be viewed as a form of a "name"—a term that does appear in that definition.  She suggests that equating a signature to a "name" is "quite a jump."  Aplt. Opening Br. at 11.  Ms. Porter further submits that the district court's interpretation of the statutory definition—which seemingly was based upon the

---

[1]       In this case, mail fraud serves as the underlying felony for Ms. Porter's aggravated identity theft conviction.  *See* 18 U.S.C. § 1028A(c)(5) (defining "felony violation enumerated in subsection (c)" to include "mail, bank, and wire fraud").  We note that while wire fraud may generally serve as a basis for an aggravated identity theft charge, in Ms. Porter's case, she was only charged with transferring, possessing, or using the identity of another in relation to *mail fraud*.  *Cf.* Aplee. Br. at 2 n.2 (conceding that we must vacate the aggravated identity theft conviction if the evidence is insufficient to support the mail fraud conviction).

Ninth Circuit's decision in *United States v. Blixt*, 548 F.3d 882 (9th Cir. 2008)[2]—sweeps too broadly.

"We review questions of statutory interpretation de novo." *United States v. Nacchio*, 573 F.3d 1062, 1087 (10th Cir. 2009). To the extent that Ms. Porter presents a challenge to the district court's instruction because the court allegedly failed to accurately give the jury the correct law, we likewise review this challenge de novo. *See United States v. Sturm*, 672 F.3d 891, 897 (10th Cir. 2012) (en banc).

We begin by setting forth § 1028(d)(7)'s definition of "means of identification" and examining the Ninth Circuit's decision in *Blixt*, which we ultimately find persuasive insofar as it holds that a signature is a form of a "name"—a term that is expressly included in the definition of "means of identification." We then address Ms. Porter's arguments to the contrary and conclude that none of her arguments alters our conclusion.

---

[2]      The district court noted: "In regard to the [aggravated identity theft] instructions, I had read a 9th Circuit case in regard to the use of a signature and whether that, as a matter of law, constitutes aggravated identity theft, and I agree with the analysis of the 9th Circuit, and I think a plain reading of the statute . . . would likewise support that, so that would be the instruction that I will give." Aplt. App. at 794. Although the district court did not identify the name of the Ninth Circuit case, we can reasonably infer—based on the context of the district court's statement and the substance of the *Blixt* case—that the district court was referring to *Blixt*. However, given our obligation to independently interpret the statute in assessing the merits of Ms. Porter's challenge, the outcome here does not turn on whether our inference is correct.

8

**A**

Congress has defined the term "means of identification" as

> *any name* or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including *any*—
>
> (A) *name*, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;
>
> (B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;
>
> (C) unique electronic identification number, address, or routing code; or
>
> (D) telecommunication identifying information or access device.

18 U.S.C. § 1028(d)(7) (emphases added). Notably, a "name" may conceivably constitute a "means of identification" in two ways under the statute. Standing "alone" it may constitute a "means of identification." And, pursuant to subsection (A), a "name" may constitute a "means of identification" because it constitutes one species of "any other information" that, "in conjunction with" "any name or number," "may be used . . . to identify a specific individual."

In *Blixt*, the Ninth Circuit expressly made what Ms. Porter labels a "jump." Like Ms. Porter, Ms. Blixt was charged with using "a means of identification of another person" to commit mail fraud (specifically, forging signatures on checks). *See* 548 F.3d at 884, 887. When *Blixt* was decided, "[w]hether the use of

9

another's signature constitute[d] a 'means of identification' for purposes of the Aggravated Identity Theft statute ha[d] not yet been resolved by [the Ninth Circuit] or any other circuit." *Id.* at 886. The Ninth Circuit "h[e]ld as a matter of first impression that forging another's signature constitutes the use of that person's name and thus qualifies as a 'means of identification' under 18 U.S.C. § 1028A."[3] *Id.*

The Ninth Circuit reasoned that the definition

> includes the use of a name, alone or in conjunction with *any other* information, as constituting the use of a means of identification so long as the information taken as a whole identifies a specific individual. There is nothing in the language of the statute that suggests the use of another's name in the form of a signature is somehow excluded from the definition of "means of identification."

*Id.* at 887. The court went on to reason that "[b]y using the word 'any' to qualify the term 'name,' the statute reflects Congress's intention to construct an expansive definition." *Id.* Thus, if it had found that signatures were categorically *not* names and thus not included within the definition, it would have disregarded the "settled principle of statutory construction that we must give effect, if possible, to every word of the statute." *Id.* (quoting *Bowsher v. Merck & Co.*, 460 U.S. 824, 833 (1983)) (internal quotation marks omitted).

---

[3]      Here, the district court did not instruct the jury that a signature was specifically a "name" within the meaning of § 1028A. Nonetheless, the district court appears to have been influenced by the Ninth Circuit in *Blixt*, which so held.

10

According to *Blixt*, "[c]ategorically carving out a signature from this definition, although a signature is commonly understood to be the written form of a person's name, would impermissibly narrow the definition of 'name' in the statute."[4] *Id.* (footnote omitted); *see also id.* at 887 n.1 ("Black's Law Dictionary defines the term 'signature' to mean '[a] person's name or mark written by that person or at that person's direction.'" (alteration in original) (quoting *Black's Law Dictionary* (8th ed. 2004)). *Blixt* concluded that the legislative history "strongly supports a conclusion that . . . forgery of . . . signature[s] constitutes the use of a 'means of identification' because it conforms precisely to the conduct Congress sought to proscribe—wrongfully obtaining and using [another person's] signature for [one's] own economic gain." *Id.* at 888.

Panels of at least two of our sister circuits have expressly endorsed in unpublished (i.e., non-precedential) decisions the holding of *Blixt*. *See United States v. Williams*, --- F. App'x ----, 2014 WL 278432, at *1 (6th Cir. Jan. 27, 2014) ("[A]nother's name in the form of a signature is [included in] the definition of means of identification." (alterations in original) (quoting *Blixt*, 548 F.3d at 887)) (internal quotation marks omitted); *United States v. Little*, --- F. App'x ----, 2014 WL 155775, at *2 (11th Cir. Jan. 16, 2014) (per curiam) (citing *Blixt*, and

_____

[4]    Even if no one could decipher a name from a signature, the Ninth Circuit found that a "signature was meant to be a particularized rendering of [a] name" and that a "signature, however illegible, was thus nothing more than [a] name written in a particular way and meant to identify [a person], specifically." *Blixt*, 548 F.3d at 888.

11

commenting that "we have no cause to depart from the plain meaning of the statute, under which a person's name on a check qualifies as a means of identification under § 1028A"); *see also United States v. Lewis*, 443 F. App'x 493, 496 (11th Cir. 2011) (per curiam) (citing *Blixt* and noting that "[a]s the signature of an individual's name specifically identifies that individual, we conclude that forging another's signature constitutes the use of a 'means of identification'"), *cert. denied*, --- U.S. ----, 132 S. Ct. 2742 (2012).

We also view *Blixt* favorably, concluding that its reasoning is persuasive. In reaching that conclusion, we are mindful that *Blixt*'s reasoning and result accord with the plain meaning of the term "signature." *See* Webster's Third New International Dictionary 2116 (2002) (defining "signature" as, among other things, "the name of a person written with his own hand to signify that the writing which precedes accords with his wishes or intentions" or "the act of signing one's name"). And *Blixt*'s reasoning and result are also fully congruent with well-worn principles of statutory construction. In addition to the principle that *Blixt* expressly relied on—the so-called "surplusage canon," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) ("The surplusage canon holds that it is no more the court's function to revise by subtraction than by addition."); *see* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 860 (2d ed. 1995) ("Courts often recite the canon of construction that prevents them from reading statutory or contractual language in a way that

12

renders part of it surplusage."); *see also* William N. Eskridge, Jr., et al.,

*Legislation and Statutory Interpretation* 275 (2d ed. 2006) (noting "the

presumption that every statutory term adds something to a law's regulatory

impact")—it is also notable that *Blixt* relied on another statutory-construction

principle that we believe is quite apposite here.

Specifically, *Blixt* tacitly relied on the so-called "general-terms canon" that

holds that "[g]eneral terms are to be given their general meaning." Scalia &

Garner, *supra*, at 101 (boldface omitted). We agree with *Blixt* that, when

Congress used the general term "any" to modify the term "name," it meant to give

that term an "expansive" meaning. *Blixt*, 548 F.3d at 887; *see, e.g.*, *Nat'l Credit

Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 727 F.3d 1246, 1267 (10th

Cir. 2013) ("Read naturally, the word 'any' has an expansive meaning . . . ."

(quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008)) (internal

quotation marks omitted)), *pet. for cert. filed*, 82 U.S.L.W. 3307 (U.S. Nov. 8,

2013) (13-576); *United States v. S. Half of Lot 7 & 8, Block 14, Kountze's 3rd

Addition to the City of Omaha*, 910 F.2d 488, 489 (8th Cir. 1990) (en banc)

("Congress's use of the word 'any' to describe property 'undercuts a narrow[er]

construction.'" (alteration in original) (quoting *United States v. James*, 478 U.S.

597, 605 (1986))).

Accordingly, guided in substantial part by *Blixt*, we hold that a signature is

a form of "name" for purposes of § 1028(d)(7)'s definition of "means of

13

identification."  Moreover, even though as noted *supra* a "name" functions as a "means of identification" in two distinct ways under the statute, we see no principled reason to accord the term a different meaning and scope in its two statutory iterations—especially since the term "name" is repeated in the same independent clause.  *See Miss. ex rel. Hood v. AU Optronics Corp.*, --- U.S. ----, 134 S. Ct. 736, 743 (2014) (noting that "the presumption that a given term is used to mean the same thing throughout a statute is at its most vigorous when a term is repeated within a given sentence" (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)) (internal quotation marks omitted)); *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 501 (1998) (discussing "the established canon of construction that similar language contained within the same section of a statute must be accorded a consistent meaning"); *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) (noting that "[t]he normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning" (internal quotation marks omitted)).

Both iterations of the term "name" are qualified by the term "any," which as noted suggests Congress's intent that the term be construed broadly.  And, in each instance in which the term is used, its core attribute is the same: it "may be used . . . to identify a specific individual."  18 U.S.C. § 1028(d)(7).  These observations support our view that the term "name" should be construed consistently.  *Cf. First Nat'l Bank of Durango v. Woods (In re Woods)*, --- F.3d --

14

--, 2014 WL 630470, at \*7 (10th Cir. 2014) (declining to definitively opine—that is, "to say"—that the statutory phrase "arise out of a farming operation" has precisely the same meaning in the two places it appears in a statutory sentence, principally because "the phrase as found in the [principal-residence-debt] exception has a different—in some respects more narrow—point of focus than the phrase as found in the [fifty-percent-farm-debt] rule"); Scalia & Garner, *supra*, at 171 (noting that "the presumption [of consistent usage] makes sense when applied . . . pragmatically"). Moreover, the analysis of § 1028(d)(7) found in the published and unpublished opinions of our sister circuits (at the very least tacitly) accepts the premise that the term "name" has the same meaning in the introductory clause of § 1028(d)(7) and in subsection (A). *See United States v. Alexander*, 725 F.3d 1117, 1120–21 (9th Cir. 2013); *Lewis*, 443 F. App'x at 495–96. Accordingly, we are comfortable concluding that there is no principled reason to accord the term "name" a different meaning and scope in its two iterations in § 1028(d)(7). Thus, with the full text of the definition in mind, we hold that a signature is a form of a "name"; consequently, it is a "means of identification" under § 1028(d)(7). In other words, because a "name" is expressly included in the definition of "means of identification," so is a signature, because it is a form of a "name." Therefore, the district court did not err in instructing the jury that "[a] person's signature is a 'means of identification.'" Aplt. App. at 47.

15

**B**

Having concluded that the district court's challenged instruction concerning a "means of identification" was not erroneous, we now specifically address and reject Ms. Porter's arguments to the contrary.

**1**

Ms. Porter asserts that Application Note 9(C)(iii)(II) to § 2B1.1 of the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") is the "clearest contradiction of a signature as being a means of identification." Aplt. Opening Br. at 13. Subsection 2B1.1(b)(11)(C)(i) of the Guidelines provides: "If the offense involved . . . the unauthorized transfer or use of any means of identification unlawfully to produce or obtain *any other* means of identification . . . increase by 2 levels." U.S.S.G. § 2B1.1(b)(11)(C)(i) (2012) (emphasis added).[5] Application

[5] The Guidelines language and citations that Ms. Porter references suggest that she makes her arguments with reference to the edition of the Guidelines in effect in March 2012, when she was sentenced. *See* U.S.S.G. § 1B1.11(a) (2012) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."). In framing its responsive arguments, the government follows Ms. Porter's lead, apparently relying on the 2012 edition of the Guidelines. However, citing ex post facto concerns, in its Presentence Report ("PSR"), the U.S. Probation Office actually computed Ms. Porter's sentence using the 2010 version of the Guidelines. *See* Aplee. Supp. App. at 19 (PSR, dated Sept. 23, 2011) ("In order to avoid violating the *ex post facto* clause of the United States Constitution, . . . . in accordance with U.S.S.G. § 1B1.11, the 2010 edition of the guideline manual was applied in determining the computations . . . ."). Guidelines § 2B1.1 was substantially revised in the 2011 and 2012 editions, including a re-numbering of certain subsections. *See* U.S.S.G. App. C, Vol. III, amend. 749 (effective Nov. 1, 2011); U.S.S.G. Supp. App. C, amend. 761

(continued...)

Note 9 discusses how this subsection should be applied. Generally, it provides

that the subsection "applies in a case in which a means of identification of an

individual other than the defendant . . . is used without that individual's

authorization unlawfully to produce or obtain another means of identification."

U.S.S.G. § 2B1.1 cmt. n.9(C)(i). In other words, the subsection applies—and thus

an upward adjustment is appropriate—when the defendant uses one "means of

identification" of someone else without authorization to unlawfully produce or

obtain *another* "means of identification."

    The note provides examples of when the subsection applies. For instance,

it applies when

---

[5](...continued)
(effective Nov. 1, 2012). Nevertheless, the rationale for the Probation Office's
selection of the 2010 edition rather than the 2008 edition is not patent; ordinarily,
when ex post facto concerns arise, the Guidelines edition that was in effect when
the offense conduct occurred governs, and Ms. Porter's offense conduct
terminated in 2008, not 2010. *See* U.S.S.G. § 1B1.11(b)(1) (2012) ("If the court
determines that use of the Guidelines Manual in effect on the date that the
defendant is sentenced would violate the *ex post facto* clause of the United States
Constitution, the court shall use the Guidelines Manual in effect on the date that
the offense of conviction was committed."). However, we find no evidence in the
record that the parties objected to Probation's choice of the 2010 edition.
Ultimately, we need not delve further into this imbroglio. Focusing on the task at
hand, we note that the language of the Guidelines implicated by Ms. Porter's
argument here does not appear to have changed between the 2010 edition
(actually applied) and the (otherwise applicable) 2012 edition. Therefore, for the
limited purpose of addressing Ms. Porter's argument here, we follow the parties'
apparent approach. Accordingly, all further references to the Guidelines are to
the 2012 edition.

[a] defendant obtains an individual's name and social security number from a source (e.g., from a piece of mail taken from the individual's mailbox) and obtains a bank loan in that individual's name. In this example, the account number of the bank loan is the other means of identification that has been obtained unlawfully.

U.S.S.G. § 2B1.1 cmt. n.9(C)(ii)(I).[6]

More relevant to Ms. Porter's argument, the note also provides examples of when § 2B1.1(b)(11)(C)(i) does *not* apply. Of considerable importance, in Ms. Porter's view, the note provides that the subsection does not apply where "[a] defendant forges another individual's signature to cash a stolen check. Forging another individual's signature is not producing *another* means of identification." U.S.S.G. § 2B1.1 cmt. n.9(C)(iii)(II) (emphasis added). Ms. Porter contends that, while the Guidelines are advisory and not controlling legal authority here, "they are certainly illustrative" of Congress's intent. Aplt. Opening Br. at 13. In her

---

[6]    According to the Guidelines, the subsection also applies in the following situation:

A defendant obtains an individual's name and address from a source (e.g., from a driver's license in a stolen wallet) and applies for, obtains, and subsequently uses a credit card in that individual's name. In this example, the credit card is the other means of identification that has been obtained unlawfully.

U.S.S.G. § 2B1.1 cmt. n.9(C)(ii)(II).

18

view, this forged-signature example suggests that Congress intended a signature not be considered a "means of identification." We are not persuaded.

Putting aside for the moment our reasonable concern regarding the relevancy of the forged-signature example of Application Note 9(C)(iii)(II) to these facts—given that the example relates to a stolen check, and these facts involve no such thing[7]—we conclude that Ms. Porter's reliance on the Guidelines note is misguided. Far from providing Ms. Porter succor, it bolsters the conclusion that we reach here.

Subsection (b)(11)(C)(i) is focused on the unlawful use of one "means of identification" to produce or obtain another. And, naturally, this is also the concern of Application Note 9(C), which serves to explain the subsection's scope. *See* U.S.S.G. § 2B1.1 cmt. n.9(C)(i). Implicit in this focus on the unlawful use of a "means of identification"—say, a hypothetical means *A*—to produce or obtain another "means of identification"—a hypothetical means *B*—must be the view that both *A* and *B* are in fact "means of identification." This view applies as well to the forged-signature example. As the government puts it: "Were the forged

---

[7] Recall that the document upon which the jury found Ms. Porter forged a signature was not a check, as contemplated by the Application Note, but rather was an LM report sent to the DOL. *See* Aplt. App. at 832–34 (reflecting Ms. Porter's testimony that she signed all of the LM reports for the AMC Council presented by the government at trial); Aplt. Ex. 79 (AMC's LM Report ostensibly containing Ms. Moilanen's signature); Aplt. App. at 525–27 (testimony of Ms. Moilanen denying that she received or signed the report).

19

signature not a 'means of identification,' there would be no potential for a defendant to obtain '*another* means of identification' . . . . Without this basic premise, the application note would make little sense." Aplee. Br. at 19 (emphasis added).

What causes subsection (b)(11)(C)(i) to be inapplicable in the situation of the unlawful use of a forged signature to cash a stolen check is *not* that the forged signature is not a "means of identification"; rather, it is that the forged signature produces or obtains cash, not *another* "means of identification."[8] *See United States v. Shanks*, 452 F. App'x 922, 926 (11th Cir.) (per curiam) ("Although the commentary for U.S.S.G. § 2B1.1 does exclude forging a signature on a check from the meaning of 'producing another means of identification,' it does not similarly disqualify forging a signature from constituting a means of identification. As there has been no allegation that [Defendant] produced another

---

[8] This point is reinforced by examining the other instance when Application Note 9(C) says the subsection does not apply: "A defendant uses a credit card from a stolen wallet only to make a purchase. In such a case, the defendant has not used the stolen credit card to obtain another means of identification." *See* U.S.S.G. § 2B1.1 cmt. n.9(C)(iii)(I). It is beyond peradventure that the "credit card" in this example is "a means of identification," *see, e.g.*, *id.* cmt. n.9(C)(ii)(II) ("In this example, the credit card is the other means of identification that has been obtained unlawfully."); no concern about this fact causes the subsection not to apply. The reason that the subsection does not apply is that the credit card is being unlawfully used "only to make a purchase," not to produce or obtain *another* "means of identification." The Guidelines drafters applied the same reasoning to exclude a forged signature on a stolen check that was used only to produce or obtain cash, not *another* means of identification.

20

means of identification by forging [the victim's] signature, this commentary has no bearing on this case." (citation omitted)), *cert. denied*, --- U.S. ----, 132 S. Ct. 2696 (2012). Thus, we conclude that Ms. Porter's reliance on Application Note 9(C)(iii)(II), to establish that a signature is not a "means of identification" for purposes of § 1028(d)(7) is misplaced; if it is relevant at all, that note actually reinforces the converse view that we endorse here (i.e., a signature is a "means of identification").

**2**

Ms. Porter contends that, if Congress had meant to include signature as a "means of identification," then it would have expressly used that word in § 1028(d)(7). She states that "the statute is not short on elements that can be considered to be 'a means of identification.'" Aplt. Opening Br. at 11. This argument is unavailing.[9] There is no indication in the statute that Congress

---

[9] Although her argument is far from pellucid, Ms. Porter attempts to bolster her conclusion that the omission of the term "signature" from the definition of "means of identification" reflects a deliberate congressional choice, by referencing snippets of the legislative history of 18 U.S.C. §§ 1028 and 1028A. Stripped to its essentials, Ms. Porter's argument appears to be that, given the seriousness of Congress's concern with the problem of identity theft—purportedly reflected in the cited legislative history—and also Congress's directives to the Sentencing Commission to respond to its concern, one would expect to find the term "signature" included in a statutory or Guidelines definition of "means of identification," if that were actually Congress's intent; but it is not present in either context. Ms. Porter's argument, however, is built on two premises: first, that a signature is not already included in the statutory definition of "means of identification" of § 1028(d)(7), even though that provision explicitly
(continued...)

21

intended to exclude signature from the definition of a "means of identification."

Quite to the contrary, under the view that we adopt here, Congress contemplated

that a signature was *included* within the definition of "means of identification" by

virtue of the statute's express inclusion in that definition of the term "name."  As

the Ninth Circuit reasoned in *Blixt*, "[b]y using the word 'any' to qualify the term

'name,' [§ 1028(d)(7)] reflects Congress's intention to construct an expansive

definition."  548 F.3d at 887.

At bottom, we recognize that, by endeavoring to have us infer that

Congress meant to exclude a signature from the definition of "means of

identification" because it did not expressly use the term "signature," in effect,

Ms. Porter seeks to have us apply a version of the "negative-implication canon"

of statutory construction.  *See* Scalia & Garner, *supra*, at 107.  The Latin name

for this canon is *expressio unius est exclusio alterius*.  It provides that "to express

or include one thing implies the exclusion of the other, or of the alternative."

*Black's Law Dictionary* 661 (9th ed. 2009); *see* William D. Popkin, *A Dictionary*

*of Statutory Interpretation* 88 (2007) ("The 'expressio unius' canon means that

the expression of one thing excludes any inference—based on statutory text,

--------

[9](...continued)
includes the term "name"; and second, that the Guidelines do not in fact
contemplate that a signature is a "means of identification."  Both premises are
false—as we establish, respectively, in Part II.A, *supra*, and this subpart, and in
Part II.B.1, *supra*.

22

structure, or purpose—that other similar items are included in the statute."). However, "[v]irtually all the authorities who discuss the negative-implication canon emphasize that it must be applied with great caution, since its application depends so much on context. . . . Context establishes the conditions for applying the canon . . . ." Scalia & Garner, *supra*, at 107. And "[c]ommon sense often suggests" when the context calls for its application. *Id.*

Here, "common sense" clearly indicates the inappropriateness of applying the negative-inference canon. This is because, far from expressing through the statute's text and structure, that the definition of "means of identification" is an exhaustive, or a comprehensive, expression of intended means—which ordinarily would inferentially exclude other means—Congress, by its use of the term "including," signaled precisely the obverse intent. *See, e.g.*, *Fed. Land Bank of St. Paul v. Bismark Lumber Co.*, 314 U.S. 95, 100 (1941) (noting that "the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle"); Scalia & Garner, *supra*, at 132 (noting that "the word *include* does not ordinarily introduce an exhaustive list"). More specifically, as commentators have stated: "When a definitional section says that a word 'includes' certain things, that is usually taken to mean that it may include other things as well." Scalia & Garner, *supra*, at 226.

And courts have held as much in construing § 1028(d)(7). *See Alexander*, 725 F.3d at 1120 ("[S]ubsections (A) through (D) [of § 1028(d)(7)] are preceded by the word 'including,' which suggests that the list is illustrative rather than exhaustive."); *see also United States v. Foster*, 740 F.3d 1202, 1207 (8th Cir. 2014) ("The section [i.e., § 1028(d)(7)] then lists several *examples* of the type of information that may help to specify an individual, *including, but not limited to*, a social security number, date of birth, driver's license number, or taxpayer identification number." (emphases added)). The breadth of the definition of "means of identification" is further underscored by the use of the term "any" before the term "including"; the term "any," as we have seen, "reflects Congress's intention to construct an expansive definition." *Blixt*, 548 F.3d at 887. In sum, for the foregoing reasons, we reject Ms. Porter's contention that, if Congress had meant to include signature as a "means of identification," then it would have expressly used that word in § 1028(d)(7).

**3**

Lastly, Ms. Porter urges us to follow the district court's decision in *United States v. Griffiths*, No. 4:10-CR-3-SPM/WCS-1, 2010 WL 2652341 (N.D. Fla. July 1, 2010). *See* Aplt. Opening Br. at 16. In that case, the court granted Mr. Griffiths's motion for judgment of acquittal and acquitted Mr. Griffiths of aggravated identity theft. *See* 2010 WL 2652341, at *1. "The issue [was]

24

whether the passing of checks stolen from the mails constitutes aggravated identity theft under 18 U.S.C. § 1028A." *Id.* Specifically, Mr. Griffiths, an employee of the U.S. Postal Service, stole checks from the mail prior to their delivery to the intended recipients; then, he deposited the checks, forged with the signatures of the individuals named on the checks. *Id.* In one count, he was charged with "identity theft for passing the check, and thereby using the 'means of identification' presented on the check." *Id.* The court held that "where the name, account number, and routing number provided on the check are not used separately and independently from the transaction by paper instrument, that is, the passing of the check itself—there is no identity theft under [§ 1028A]." *Id.* at *4.

Proceeding to our analysis, at the outset, we state the obvious: *Griffiths* is not binding on us and amounts to no more than one voice from a Florida district court in the Eleventh Circuit. Furthermore, even when we pause to assess its merits, we find Ms. Porter's reliance on *Griffiths* to be misguided. The principal issue there was whether passing a check constituted use of an "access device" under § 1028(d)(7)(D). *See id.* at *1–2. Section 1028(d)(7)(D) expressly includes the term "access device"; that term is defined in 18 U.S.C. § 1029(e)(1), which specifically *excludes*, by way of a parenthetical, "transfer[s] originated solely by paper instrument."[10] 18 U.S.C. § 1029(e)(1). This was the language

_____

[10]   In full, the subsection provides:

(continued...)

25

that the *Griffiths* court relied on in concluding that "the conduct of falsifying a signature on a stolen check and passing said stolen check does not constitute the use of an access device." 2010 WL 2652341, at *2.

Ms. Porter hangs her hat on the statutory analysis in *Griffiths*. She suggests that we follow the *Griffiths* court's view that "under basic statutory interpretation, a general term should not override a specific term." Aplt. Opening Br. at 16. Specifically, in *Griffiths*, the government argued that, while a check may not constitute an "access device" for purposes of subsection (D) of § 1028(d)(7), it may still satisfy the broader definition of "means of identification." *See* 2010 WL 2652341, at *3 ("[T]he Government argues that because the term 'means of identification' is described so broadly under 18 U.S.C. § 1028(d)(7), the four included categories following the definition are illustrative examples which are not intended to be exhaustive . . . ."). The *Griffiths* court was not persuaded.

_____

[10](...continued)

> the term "access device" means any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (*other than a transfer originated solely by paper instrument*)[.]

18 U.S.C. § 1029(e)(1) (emphasis added).

Observing that "the term 'access device' under subsection D [of § 1028(d)(7)] specifically excludes solely paper transactions," the court reasoned that "the more general phrase, 'means of identification,' should not be interpreted as encompassing those transactions specifically excluded by the subsequent, specific provision." *Id.*

However, we are hard-pressed to square *Griffiths*'s rationale with the broad, non-exhaustive language of § 1028(d)(7), which we examined at length *supra*. And we are not alone in reaching this conclusion. The operating premise of *Griffiths*—that the terms of subsection (D) should be read as restricting the scope of the expansive language that constitutes the remainder of § 1028(d)(7)—has been expressly repudiated in an unpublished decision by a panel of the Eleventh Circuit, the circuit in which the *Griffiths* court sits. Specifically, *Griffiths*'s premise was forcefully rejected by the Eleventh Circuit in *Lewis*:

> [Defendant] contends that, because the statutory definition of "access device" excludes "transfer[s] originated solely by paper instrument," the conduct of falsifying a signature on a stolen check and cashing the check does not constitute the knowing transfer, possession, or use, without lawful authority, of "a means of identification of another person."
>
> The flaw in [Defendant's] argument is that an "access device" is only one of several items that Congress listed, in the disjunctive, as a "means of identification." 18 U.S.C. § 1028(d)(7). Thus, simply failing to satisfy the definition of "access device" does not end the analysis with respect to whether

27

a signature on a stolen check is a "means of identification." Any name that may be used to identify a specific individual, including the individual's "name," will satisfy the definition of "means of identification," even if it does not satisfy the definition of "access device." *Id.* As the signature of an individual's name specifically identifies that individual, we conclude that forging another's signature constitutes the use of a "means of identification."

443 F. App'x at 495–96 (second alteration in original) (footnote omitted).

Another pronouncement (in an unpublished decision) from an Eleventh Circuit panel has also effectively eroded the foundation of *Griffiths*'s premise, by stressing the broad, non-exhaustive nature of the "means of identification" definition of § 1028(d)(7). *See Little*, 2014 WL 155775, at *1–2 (rejecting Defendant's argument that "because every check necessarily includes a name, applying the check exclusion [of subsection D] only to access devices renders the exclusion meaningless" and finding to the contrary "no cause to depart from the plain meaning of the statute, under which a person's name on a check qualifies as a means of identification under § 1028A").

Furthermore, in a precedential decision, the Ninth Circuit rejected a similar argument based on subsection D. *See Alexander*, 725 F.3d at 1119–20 (rejecting as a "grossly atextual reading of the statute" Defendant's argument that "by incorporating the access-device definition from § 1029(e)(1) into § 1028(d)(7)(D), Congress excluded check forgery from the crime of aggravated identity theft" and noting in support that "subsections (A) through (D) are

28

preceded by the word 'including,' which suggests that the list is illustrative rather than exhaustive . . . . Thus, whether [Defendant's] counterfeit check was an 'access device' does not answer the question whether the names and banking numbers on his counterfeit check were a 'means of identification.'").

Like *Griffiths* itself, the foregoing decisions of our sister circuits (unpublished and published) are not binding on us. However, they clearly and cogently reveal fatal flaws in *Griffiths*'s analysis. To be sure, the *Griffiths* court purported to rest its decision on the settled statutory-construction canon relating to the specific overriding the general. *See, e.g.*, Scalia & Garner, *supra*, at 183 ("If there is a conflict between a general provision and a specific provision, the specific provision prevails . . . ." (boldface omitted)). However, we harbor considerable doubt about whether the court properly applied that canon.

"[T]he general/specific canon does not mean that the existence of a contradictory specific provision voids the general provision. Only its application to cases covered by the specific provision is suspended; it continues to govern all other cases." Scalia & Garner, *supra*, at 184. In other words, the canon works to ensure that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974); *see Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("It is a basic principle of statutory construction that a statute dealing with

29

a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum."); *see also* Eskridge et al., *supra*, at 283–84 ("This rule of construction [i.e., the general-specific canon] is justified on republican grounds; the focused language suggests that Congress probably deliberated on the issue and developed a specific intent.").

Therefore, if the general-specific canon were applicable to subsection D at all, it ordinarily would operate to ensure that the broad definitional language of the remainder of § 1028(d)(7) did not negate or impair the effect of subsection D; however, that broad language, including subsections (A) through (C), would "govern all other cases." Scalia & Garner, *supra*, at 184. In purporting to apply the general-specific canon, *Griffiths* seemingly turned the canon on its head. Rather than applying the general-specific canon to preserve the operation of the specific provision (i.e., subsection D), it applied the canon to restrict the broad language of the remainder of § 1028(d)(7)—specifically, to wholly exclude from the definition of "means of identification" a forged signature that had been used to cash a check. The court equated that check-cashing transaction with "a transfer originated solely by paper instrument," § 1029(e)(1). In other words, *Griffiths* effectively applied the "contradictory specific provision [to] void[] the general provision," Scalia & Garner, *supra*, at 184, as it relates to forged signatures on checks (and logically other documents as well). We are hard-pressed to conclude that such analysis constitutes a proper application of the general-specific canon.

30

Put another way, we believe that *Griffiths*'s statutory analysis is dubious at best.

In sum, based on the foregoing, the district court decision in *Griffiths* is wholly unpersuasive. Ms. Porter's reliance on *Griffiths* is misplaced.

### III

We turn now to Ms. Porter's challenges to the sufficiency of the evidence supporting her convictions for mail fraud and wire fraud. As explicated below, we conclude that the evidence was sufficient as to all of the counts at issue.

### A

We review challenges to the sufficiency of the evidence and denials of motions for judgment of acquittal de novo. *United States v. Cooper*, 654 F.3d 1104, 1115 (10th Cir. 2011). In doing so, we must examine "whether[,] viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004) (citation omitted) (internal quotation marks omitted). "[W]e do not weigh conflicting evidence or consider witness credibility, and the fact that prosecution and defense witnesses presented conflicting or differing accounts at trial does not necessarily render the evidence insufficient." *Cooper*, 654 F.3d at 1115 (citations omitted).

### B

Ms. Porter was charged with mail fraud in Count 106 of the indictment. "The elements of federal mail fraud as defined in 18 U.S.C. § 1341 are (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of the mails to execute the scheme." *Id.* at 1116 (quoting *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003)) (internal quotation marks omitted). Ms. Porter only takes issue with the third prong of mail fraud: specifically, she claims that the government failed to prove, directly or otherwise, that she used the United States mails to execute her scheme. The underlying document for the mail fraud charge was the Form LM-3 Labor Organization Annual Report for 2006 (the "2006 LM Report"). Aplt. Ex. 79 (2006 LM Report, signed July 24, 2007). As charged in the indictment, the government's theory was that Ms. Porter "knowingly caused to be delivered by mail the AMC LM-3 form for fiscal year 2006 to the [DOL, OLMS], 1999 Broadway, Suite 2435, Denver CO 80202." Aplt. App. at 22; *see id.* at 19 (noting that Ms. Porter "submitted the fiscal year 2006 AMC LM-3 form to the [DOL] office located in Denver, Colorado using the U.S. Postal Service"). There is no dispute that the 2006 LM report was actually received in Denver by the DOL's OLMS. However, Ms. Porter argues that "[m]ost of th[e] times" that the 2006 LM Report was referenced at trial related to "the purpose and use of a[n] LM report." Aplt. Opening Br. at 19. In other words, she contends that the primary focus of the testimony regarding the LM

32

report at trial related to its purpose and use. She asserts that "[n]one [of the references] provide evidence of how the report was delivered to Denver." *Id.* Further, she argues that the 2006 LM Report itself does not indicate "how or when" it was delivered. *Id.*

We have held, when considering the sufficiency of the evidence for mail fraud, that "[p]roof of mailing by showing an established business practice to use the mails is sufficient circumstantial evidence to require submission of the mailing issue to a jury." *United States v. Dunning*, 929 F.2d 579, 580 (10th Cir. 1991). Here, in our view, it is determinative that Ms. Porter's own testimony indicates that the routine practice was to submit the LM reports by mail. *See* Aplt. App. at 828 ("Q. What would be the normal process whenever you prepared the reports for getting both signatures on them? A. The normal procedure would be . . . . I would fill it out, sign it and give it to her [Genevieve Trujillo, then the AMC Council's treasurer] to sign it and then *mail it off*." (emphasis added)); *id.* at 829 ("Q. So your testimony is, then, that you prepared the report [i.e., the LM report regarding fiscal year 2005], you gave it to Ms. Trujillo? A. Yes. And all she had to do was sign it and *mail it*. That was it." (emphasis added)).

To be sure, exercising commendable candor, the government acknowledges that the evidence revealed "a conflict as to whether [Ms. Porter] mailed the reports directly to the [DOL] or to another officer for signature." Aplee. Br.

33

at 25. However, any such conflict is legally immaterial. The government had no obligation to prove that Ms. Porter directly mailed the 2006 LM Report to Denver. As the indictment charged, it was enough that Ms. Porter "knowingly caused" the 2006 Report "to be delivered by mail." Aplt. App. at 22; *see, e.g.*, *Pereira v. United States*, 347 U.S. 1, 8 (1954) ("[I]t is not necessary to show that petitioners actually mailed or transported anything themselves; it is sufficient if they caused it to be done."); *United States v. Weiss*, 630 F.3d 1263, 1269 (10th Cir. 2010) ("[T]here is no requirement that the perpetrator personally effect the mailing."). And a rational findfinder could conclude based on Ms. Porter's own testimony that the last act in the routine process of submitting an LM report was to "mail it off" and that Ms. Porter was well aware of this process. Consequently, as to Count 106, the jury could have rationally found that—whether she directly mailed it or not—Ms. Porter knowingly caused the 2006 LM Report to be delivered by mail to the DOL in Denver. *See, e.g., United States v. Pisciotta*, 469 F.2d 329, 331 (10th Cir. 1972) ("A defendant causes the mails to be used when he does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can be reasonably foreseen, even though not actually intended."); *see also United States v. Gamble*, 737 F.2d 853, 855 (10th Cir. 1984) (collecting cases). Accordingly, we conclude that Ms. Porter's challenge to her mail fraud conviction is without merit.

34

# C

"To convict a defendant of wire fraud under 18 U.S.C. § 1343, the government must show (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) . . . use of interstate wire . . . communications to execute the scheme."[11] *United States v. Caldwell*, 560 F.3d 1202, 1207 (10th Cir. 2009) (omissions in original) (quoting *United States v. Gallant*, 537 F.3d 1202, 1228 (10th Cir. 2008)) (internal quotation marks omitted).

Ms. Porter challenges the sufficiency of the wire fraud evidence for Counts 1–17, 20–24, 26–28, 30, 32–39, 41, 43–45, 48–70, 72–74, 76–78, 80–82, 84–85, 87, 90–91, 93–94, 96, 99–100, and 102–105. We review Ms. Porter's challenges to Counts 3–17, 20, 21, 26–28, 54, and 55 de novo because she raised objections to these counts before the district court. Doing so, we conclude that her challenges are without merit and must fail.

---

[11]    The wire fraud statute, 18 U.S.C. § 1343, provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate . . . commerce, any writings . . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

35

On the other hand, Ms. Porter failed to preserve her objections to the remaining counts. Ordinarily, Ms. Porter "could not prevail unless [s]he could successfully run the gauntlet created by our rigorous plain-error standard of review." *United States v. McGehee*, 672 F.3d 860, 876 (10th Cir. 2012); *see United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007) (discussing the elements of the plain-error standard).[12] However, because even under a de novo standard of review—one that is more favorable to Ms. Porter—her challenges to these wire fraud counts clearly fail, we accept the government's tacit invitation to forego a separate plain-error analysis. *See* Aplee. Br. at 24 ("In her opening brief . . . [Ms. Porter] attempts to challenge the sufficiency of the evidence as to counts 1 through 106. Nonetheless, even under a de novo standard of review, including those counts that she did not specifically object to, Porter's insufficiency claim fails in its entirety.").

Ms. Porter claims that the evidence was insufficient to sustain a conviction for the challenged wire fraud counts because there was generally no evidence that demonstrated the unauthorized nature of the transactions covered by those counts. Ms. Porter raises specific arguments only with respect to certain counts; we

---

[12] Specifically, to obtain relief under plain-error review, Ms. Porter would need to show "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Flonnory*, 630 F.3d 1280, 1288 (10th Cir. 2011) (quoting *United States v. Uscanga-Mora*, 562 F.3d 1289, 1295 (10th Cir. 2009)) (internal quotation marks omitted).

discuss those counts below. But, with respect to the balance of the counts, by failing to offer us specific arguments or citations to legal authority or the record, Ms. Porter has waived our review of her sufficiency challenges. *See, e.g.*, *United States v. Bader*, 678 F.3d 858, 894 (10th Cir.) (holding that Defendant's "remaining two claims" were "waived on account of his utter failure to explain or in any way substantiate his allegations, including with citation to legal authority"), *cert. denied*, --- U.S. ----, 133 S. Ct. 355 (2012); *Cooper*, 654 F.3d at 1128 (holding that "[a]s [Defendant] provides no other argument or authority in support of this claim, he has insufficiently raised it on appeal").

As for counts she challenges, Ms. Porter attacks the sufficiency of the evidence on Counts 3–17, 20–21, 26–28, and 54–55. *See* Aplt. Opening Br. at 20–21. She argues that "[t]he only evidence entered on these counts [was] bank records in exhibit 148"—which is a summary of the AMC Council's bank account statements from April 2001 through December 2008—and that the case agent, Ms. Abendroth, did not mention these items until asked about them on cross examination. *Id.* at 20.

Contrary to Ms. Porter's assertions, however, Ms. Abendroth testified regarding Exhibit 148 on direct examination. After moving to admit Exhibit 148, the government's counsel briefly deviated to a different line of questioning, as the records were gathered. *See* Aplt. App. at 774 ("The Court: 148 will be admitted.

37

. . . Q. Ma'am, I'm going to move to a different topic briefly while we gather those records."). Government's counsel eventually returned to Exhibit 148. *See id.* at 781. At that point, Ms. Abendroth testified specifically regarding a February 15, 2008 purchase made by Ms. Porter at Touch Discount Day Spa, *id.* at 782, a March 22, 2007 purchase made by Ms. Porter at Northeast Family Dental, *id.* at 783–84, and a Lowe's purchase made on an unspecified date, *id.* at 784. With respect to each of these purchases, Ms. Abendroth was able to connect receipts bearing Ms. Porter's signature to the bank statements contained in Exhibit 148. *Id.* at 782–84. Ms. Abendroth also testified to a purchase made at "MSCN," or Musician's Friend, for $816.09. *Id.* at 785.

Ms. Abendroth confirmed that "there [was] a correlation between those records found on Ms. Porter's computers and the charges in the bank statements[.]" *Id.* at 785–86. She also confirmed that this was "the kind of analysis [she] did to make sure that [she was] bringing charges against the right person"—she "tried to match up those purchases found in the bank statements [contained in Exhibit 148] to personal records associated with [Ms. Porter]," and she "contacted the various vendors to obtain information about the charges that appear on the bank statements." *Id.* at 786; *see also id.* at 773 (reflecting the testimony of Ms. Abendroth to the effect that she "put a box around the charges [listed in Exhibit 148] that are included in the indictment").

Ms. Abendroth did not testify specifically as to each purchase forming each count of wire fraud against Ms. Porter; however, her testimony spoke generally to the unauthorized nature—that is, illegality—of the purchases reflected in all of the counts. In that regard, Ms. Abendroth confirmed that she "looked at every single one of those purchases to determine that they were unauthorized." *Id.* at 770. Viewing the evidence in the light most favorable to the verdicts, we conclude that Ms. Abendroth's testimony was sufficient for a rational factfinder to determine that the purchases at issue in the counts were unauthorized.

Ms. Porter lays down focused fire on two particular counts, but her contentions do not alter our conclusion. Specifically, she challenges the sufficiency of the evidence for Count 60, involving a charge for DBC Blick Art Material, and Count 72, involving a charge for GAF Enterprises. *See* Aplt. Opening Br. at 21–22. She speculates that DBC Blick Art Material "could be anything under the sun," that there was no evidence presented as to what GAF Enterprises may be, and that the GAF Enterprises charge "could easily have been a charge from a national convention for services connected with a hotel." *Id.*

However, Ms. Abendroth's testimony reasonably suggests that the government conservatively characterized ambiguous transactions as "authorized" rather than "unauthorized." When asked why her analysis differed from that of William Dameron, the IAM's auditor, Ms. Abendroth explained that "there were

39

certain things that we did not include as unauthorized that he included in his chart as unauthorized." Aplt. App. at 765. "[F]or example, funds paid to the United States Postal Service, we weren't able to establish through our investigation that those were not used for legitimate union business, so we included those in the authorized section." *Id.* And, as noted, Ms. Abendroth specifically testified that she examined each purchase to determine whether it was unauthorized. *Id.* at 770. A rational factfinder was entitled to take note of Ms. Abendroth's conservative approach to identifying unauthorized charges and credit her testimony that all of the ones included in the indictment—including those reflected in Counts 60 and 72—were unauthorized. It would be improper for us to second-guess such a credibility determination, *see, e.g.*, *Cooper*, 654 F.3d at 1115, and Ms. Porter's conjectural contentions do not even tempt us to do so.

Even if Ms. Abendroth's testimony were not sufficient to seal Ms. Porter's fate—that is, to support guilty verdicts on the challenged wire fraud counts—we note that there was ample additional evidence, including the testimony of other witnesses, that would have reinforced Ms. Abendroth's testimony and permitted a rational factfinder to adjudge Ms. Porter guilty of those counts. The evidence was clear that the only permissible means for disbursing funds from the AMC Council and Local 2049 was by check, with two authorizing signatures. In particular, as of January 2, 2005, the IAM instituted a policy forbidding the use of debit and credit cards by members. Yet, the jury was shown the AMC Council's account

40

summaries and Wells Fargo bank statements reflecting purchases using an ATM

debit card that had been issued in Ms. Porter's name in 2004. Furthermore, the

evidence revealed to the jury that Ms. Porter sent fraudulent bank statements to

NFFE officers through 2008; it is beyond peradventure that such acts of

concealment point in the direction of guilt. *See, e.g.*, *United States v. Davis*, 437

F.3d 989, 996 (10th Cir. 2006) ("[F]alse exculpatory statements . . . 'are

admissible to prove circumstantially consciousness of guilt or unlawful intent.'"

(quoting *United States v. Zang*, 703 F.2d 1186, 1191 (10th Cir. 1982))); *United

States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003) (noting that fraudulent

intent "may be inferred from evidence that the defendant attempted to conceal

activity" (quoting *United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997))

(internal quotation marks omitted)); *accord United States v. Sasso*, 695 F.3d 25,

29 (1st Cir. 2012) ("[A]n attempt to cover up the commission of a crime implies

consciousness of guilt."); *United States v. Elashyi*, 554 F.3d 480, 499 (5th Cir.

2008) ("[G]uilty knowledge can be inferred from false statements and attempted

coverups."); *United States v. Deutsch*, 451 F.2d 98, 118 (2d Cir. 1971) (noting

that Defendant's "insistence on the use of nominee names evinced a desire to

conceal the transaction, from which the jury could infer consciousness of guilt").

In sum, we conclude, when viewing the totality of the evidence in the light most favorable to the verdicts, that a rational trier of fact could have found Ms. Porter guilty of the challenged wire fraud counts beyond a reasonable doubt.

**IV**

For the foregoing reasons, we **AFFIRM** Ms. Porter's convictions and uphold the district court's resulting judgment.