**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 09-4543

CHINEDU CASHMIR LUKE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:08-cr-00071-JFM-1)

Argued: October 29, 2010

Decided: December 8, 2010

Before WILKINSON, KING, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Agee joined.

## COUNSEL

**ARGUED**: Robert Charles Bonsib, MARCUSBONSIB, LLC, Greenbelt, Maryland, for Appellant. Sandra Wilkinson, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Megan E. Green, MARCUSBONSIB, LLC, Greenbelt, Maryland, for Appel-

lant. Rod J. Rosenstein, United States Attorney, Anthony V. Teelucksingh, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Chinedu Cashmir Luke was convicted by a jury of conspiracy to commit identification document fraud in violation of 18 U.S.C. § 1028(f) and aggravated identity theft in violation of 18 U.S.C. § 1028A. Luke, along with several coconspirators, engaged in a scheme to procure fraudulent U.S. passports. In particular, Luke and others submitted passport applications in the name of innocent and unwitting third parties. These applications included real identification documents belonging to those innocent individuals alongside the conspirators' photographs and actual contact information. If issued, the passports would have allowed Luke's coconspirators to pose as U.S. citizens (and more specifically, as those innocent third parties) for purposes of international travel.

On appeal, Luke argues that the district court erred in denying his motion for judgment of acquittal on the ground that his conduct was not prohibited by the statutes of conviction. We disagree. The theory of Luke's § 1028(f) conviction was that he conspired to violate 18 U.S.C. §§ 1028(a)(2) and (a)(4). But those provisions, like § 1028A, are broadly worded statutes that are aimed at the precise type of criminal scheme that Luke carried out. Finding that Luke was properly convicted on all counts, we affirm the judgment of the district court.

I.

Chinedu Luke is a naturalized United States citizen who originally hailed from Nigeria. In 1988, Luke fathered a son

named Jonathan with Angela Lilly. Jonathan has lived with Angela Lilly his entire life and had adopted her last name as his own. However, while the exact dates are uncertain, Luke (unbeknownst to Jonathan or his mother) changed his son's legal name to "Jonathan Osuagwu" for a portion of 2008. Luke then obtained a variety of identification documents in Jonathan Osuagwu's name. In September 2008, Angela Lilly changed Jonathan's last name back to Lilly, but Luke retained possession of the Osuagwu identification documents.

On November 19, 2007, a passport application was submitted on behalf of an individual claiming to be Jonathan Osuagwu at the U.S. Passport Agency in Philadelphia. The application contained a Washington D.C. birth certificate, a Maryland state identification card, a credit card, a Social Security card, and a Selective Service registration certificate – all of which were in Jonathan Osuagwu's name. Michael Persons, a fraud prevention manager at the office, decided to schedule an interview with the applicant. Luke accompanied the applicant to the interview and claimed that the applicant was his son Jonathan, with whom he had recently grown reacquainted after a long period of separation. Luke further claimed that the applicant needed the passport to visit family in Nigeria. Luke even went so far as to execute an affidavit stating that the applicant was actually Jonathan.

Nevertheless, Persons concluded that the applicant who attended the interview simply did not match the photo submitted along with the application. When Persons challenged the applicant's identity, the applicant left. Luke, however, called him several times in an effort to get him to return. Moreover, Luke continued to argue that the passport should be issued. While Luke claims that he ultimately tried to withdraw the application, the government asserts that Luke did precisely the opposite, agitating to get the passport and leaving the passport office only when it was clear he would not obtain it. Either way, it was clear that Luke made several false statements in support of the Philadelphia application: the applicant

was not actually Jonathan Osuagwu, meaning that the identification documents submitted with the application did not belong to him.

That was not the only fraudulent application with which Luke was involved. In October 2006, an unknown applicant submitted a passport application in the name of Rendell Cook at the U.S. Passport Agency in Catonsville, Maryland. The application was immediately flagged for investigation because it was rife with errors and omissions. In addition, the supporting identification documents (a Washington, D.C. birth certificate and a Maryland state identification card) had been recently issued. Despite containing Rendell Cook's name and Social Security number, the application listed Luke's address and home telephone number as Cook's contact information and contained a photograph of an unknown third party billed as Cook himself.

Agent Matthew Souliere of the Diplomatic Security Service at the Department of State began an investigation into this application. The Department mailed a letter to Rendell Cook at the address listed on the application, meaning that the letter fell into Luke's hands. Luke responded by sending a personal reference letter in support of the Cook application, claiming to be well acquainted with Cook by virtue of being married to his half-sister, Julie. Souliere's next step was to call the phone numbers listed on the application, which again belonged to Luke. This time, Luke pretended to be a man named Mike Ward and claimed that he was Rendell Cook's employer during the end of 2006. Luke (posing as Ward) also asserted that the address listed on the application was the last known address for Rendell Cook. In a later phone call with Souliere, Luke truthfully identified himself in order to complain about the delay in processing the application.

As would later become clear, almost all of Luke's statements to Souliere and on the application were false. Cook had not applied for a passport in 2006, or for that matter, at any

point. Instead, from February to March of 2006, Cook had actually been hospitalized for a brain injury. Cook did not have a sister named Julie, much less one married to Luke. And while Luke (who had been employed as a respiratory therapist) provided care to Cook during his hospitalization, the two men never actually met. That hospital stay, however, had allowed Luke to gain access to Cook's Social Security number.

In February of 2008, ten agents, including Souliere and an agent from the Social Security Agency, executed a search warrant at Luke's home address. Luke was the only person present at the time. The investigators interviewed Luke and asked him about the photograph submitted with the Catonsville, Maryland application. In response, Luke (thinking about the Philadelphia application) stated that the photo was of his son, Jonathan Osuagwu, and began to discuss the Philadelphia passport application. This admission informed the agents about the existence of that application; until then, they had been unaware of its submission. The officers also questioned Luke about his relation to Rendell Cook. Luke initially claimed that he had dated Cook's half-sister Grace. But he quickly recanted that statement and instead asserted that he met Cook at a party in April 2006. Luke further contended that Cook had asked for Luke's help in applying for a passport. As Cook would confirm at trial, however, all of these statements were false.

The agents also found a great deal of physical evidence during the search. Among other things, the agents discovered identification documents that had been used in support of the Catonsville and Philadelphia applications, including the Osuagwu documents. Additionally, they found copies of the photographs that had accompanied the Rendell Cook application and a receipt indicating that Luke had purchased travel for Jonathan Osuagwu. Finally, the agents found identification documents that had been issued to a male but that were under the name of Luke's long-deceased daughter, Adriane.

Luke would later concede that his brother, Edwin, had been fraudulently using Adriane's identity.

On June 17, 2008, a grand jury indicted Luke on four counts: conspiracy to commit identification document fraud in violation of 18 U.S.C. § 1028(f) (count one), conspiracy to make a false statement in a passport application in violation of 18 U.S.C. § 1542 (count two), fraudulent use of a Social Security number in violation of 42 U.S.C. § 408(a)(7)(B) (count three), and aggravated identity theft in violation of 18 U.S.C. § 1028A(1) (count four). The theory of count one was that Luke had violated § 1028(f) – which punishes any conspiracy to commit a § 1028(a) offense – by conspiring to violate §§ 1028(a)(2) and (a)(4). On March 23, 2009, the district court granted Luke's motion for judgment of acquittal on counts two and three. That same day, a jury convicted Luke of the remaining counts. On May 18, 2009, the district court sentenced Luke to three months imprisonment on count one and twenty-four months imprisonment on count four, to be served consecutively. Luke now appeals his conviction.

## II.

Luke's primary contention is that the district court erred in denying his motion for acquittal on count one.[1] According to Luke, his conviction cannot stand because his conduct simply does not fall within the ambit of 18 U.S.C. §§ 1028(a)(2) or (a)(4) – the substantive offenses he is charged with having conspired to commit. We shall address his arguments in turn.

Luke's first argument is that he did not conspire to "knowingly transfer[ ] an identification document, authentication feature, or a false identification document knowing that such

---

[1]Luke also alleges various errors arising from the trial itself, some of which pertain to evidentiary admissions and others of which relate to the jury instructions in this case. We have reviewed these claims and find neither legal error nor an abuse of discretion on the part of the district court.

document or feature was stolen or produced without lawful authority." 18 U.S.C. § 1028(a)(2). As a threshold matter, Luke does not dispute that he conspired to "transfer" documents, and for good reason: the evidence clearly showed that he conspired to have passports transferred to him and to transfer those passports to the fraudulent applicants upon receipt. Instead, Luke challenges other aspects of his conviction.

### A.

As Luke points out, there is no evidence that the passport he attempted to obtain was "stolen." 18 U.S.C. § 1028(a)(2). Thus, his conviction must be premised on the theory that the passport was "produced without lawful authority." *Id.* But according to Luke, a document is only "produced without lawful authority" when the issuers and producers of the document "knowingly acted in a way that would strip them of their lawful authority." In other words, § 1028(a)(2) simply does not apply in situations where individuals induce clerks, officials, or other governmental actors to unknowingly dole out fraudulent identification documents. So long as the clerks or officials thought they were acting lawfully, nobody can be convicted under § 1028(a)(2) for "transfer[ring]" those documents.

This contention fails for several reasons. First, our precedent undermines the very type of argument that Luke advances. In *United States v. Rashwan*, 328 F.3d 160 (4th Cir. 2003), we confronted a situation where a defendant was convicted under 18 U.S.C. § 1028(a)(1), which, at the time, punished any individual who "knowingly and without lawful authority produces an identification document or a false identification document."[2] *See Rashwan*, 328 F.3d at 165. Rashwan obtained a Virginia identification card, learner's permit,

---

[2] 18 U.S.C. § 1028(a)(1) has since been amended to punish anyone who "knowingly and without lawful authority produces an identification document, authentication feature, or a false identification document."

and drivers license by swearing to a false Virginia address on his application. *Id.* at 162. We affirmed Rashwan's conviction on the theory that he had "aided and abetted the production of false identification documents by providing false information to the DMV with the specific intent that the agency would then produce a false identification document for him." *Id.* at 165. But that theory itself rested on the premise that his drivers license had been issued "without lawful authority" notwithstanding the fact that the DMV clerk had no "intent to commit the crime." *Id.*

Applied here, that premise is fatal to Luke's claims. Just as Rashwan (rather than the DMV clerk) could be convicted for producing an identification document without lawful authority, so too can Luke (rather than the passport officials) be convicted for conspiring to transfer an identification document produced without lawful authority. *Rashwan*, in other words, establishes that even when a clerk unknowingly creates a fraudulent identification document, that document has been produced without lawful authority.

Luke does not cite a single case that undercuts this straightforward analysis. There is a good reason for the paucity of authority behind Luke's position: Luke's reading of the statute flies in the face of Congress's purposes in enacting 18 U.S.C. § 1028. The goal of the statute was to address the increasing use of false identification documents to facilitate crimes. *See* H.R. Rep. No. 97-802, at 8 (1982) ("[The Act], as reported, will . . . serve as a strong deterrent to false identification-related crime and to the manufacturers and distributors of false identification in particular."). The text bears out that purpose, applying by its very terms to anyone who "knowingly transfers an identification document . . . knowing that such document or feature was stolen or produced without lawful authority." 18 U.S.C. § 1028(a)(2). The text does not state that it applies only to officials and clerks; on its face, it has a much broader scope. Indeed, as the Sixth Circuit has noted, "[a] reading of the several subsections of section

1028(a) indicates a congressional desire to prohibit the unlawful use of identification documents in a wide variety of circumstances." *United States v. Gros*, 824 F.2d 1487, 1491 (6th Cir. 1987).

In reality, Luke seeks nothing less than to transfer the mens rea requirement of the offense from himself to government officials. But of course, the statute is not written in any such fashion. Section 1028(a) was enacted in response to the findings of a special Federal Advisory Committee on False Identification ("FACFI") convened in 1974 by the Attorney General. H.R. Rep. No. 97-802, at 1-2. FACFI determined that false identification documents were "facilitating drug smuggling, illegal immigration, flight from justice, fraud against business and the government, and other criminal activity, at an estimated cost of over $16 billion each year," and that "genuine government identification documents could be easily obtained from the issuing offices by means of simple misrepresentations." *Id.* at 2. The purpose of § 1028, then, was to combat the increasing use of such documents by giving federal authorities broader power to punish the use of false or fraudulent identification documents in facilitating other crimes. *Id.* at 8.

As the jury found, Luke knew perfectly well that the documents in question should never have been produced, i.e. that they could not be issued upon any lawful authority. Although the U.S. Passport Agency certainly has "authority" to issue U.S. passports, it must do so on a "lawful" basis, that is, on the basis of authentic documentation and in the name of the actual person who is applying for the passport. *See* 18 U.S.C. § 1028(a)(2). That did not happen here. Accordingly, it makes little sense to limit § 1028(a)(2)'s application only to situations involving passport officials or government clerks acting ultra vires. The text would not support so restrictive a reading, which would be fundamentally at odds with § 1028(a)(2)'s more comprehensive goals.

B.

Luke's remaining argument with regards to § 1028(a)(2) is likewise flawed. Luke contends that the passport he sought to obtain is not an "identification document" within the context of the statute. In his view, the identification document in count one cannot "be the passport itself," but must instead be "other documents used to obtain the passport." To the extent Luke's argument is that a passport is never an identification document, that contention lacks merit. Passports plainly fall within the statutory definition of an identification document: "[A] document made or issued by or under the authority of the United States Government . . . which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals." 18 U.S.C. § 1028(d)(3).

If Luke is instead arguing that the statute does not permit prosecutions in situations where a defendant conspires to have a passport transferred to him by an agency, he is incorrect. Such cases fall comfortably within the statute's language. *See* 18 U.S.C. § 1028(a)(2). And in any event, the evidence at trial also established that Luke conspired to "transfer" those fraudulent passports to the applicants upon receipt. *See id.* Viewed from whatever perspective, Luke's conduct represents the precise type of crime that § 1028(a)(2) was enacted to punish.

III.

Next, Luke argues that he did not conspire to "knowingly possess[ ] an identification document (other than one issued lawfully for the use of the possessor), authentication feature, or false identification document, with the intent such document or feature be used to defraud the United States." 18 U.S.C. § 1028(a)(4). Luke does not mount any challenge to the government's assertion that he conspired to possess identification documents. Nor can he: Luke submitted two false passport applications, and, in Philadelphia, pressed for the

issuance of a passport after the fraudulent applicant had abandoned his endeavors.

Instead, Luke argues that the government cannot prove that he had any "intent . . . to defraud" because all the government could offer was speculation about the possibility that Luke or his coconspirators might use the passports to travel outside the country. According to Luke, that evidence is simply not enough. In the district court, Luke argued that the government needed to provide evidence that he intended to defraud the government out of "some tangible financial kind of benefit." Now, Luke argues that the government must prove his intent to commit an offense against the United States or to obstruct the functions of government. Either way, however, Luke's consistent refrain has been that the evidence at trial was insufficient to prove his intent to defraud the government.

We have not, to date, construed the term "intent . . . to defraud" in § 1028(a)(4) or determined what kind of proof the government must bring forth to satisfy that element. That said, there is ample reason to reject Luke's argument that the government must prove his intent to defraud the government of "some tangible financial kind of benefit." There is no textual indication of any such limitation, and construing the statute to require such proof would effectively vitiate it. As the Tenth Circuit observed in discussing 18 U.S.C. § 505, a "common sense and common definition of fraudulent intent demands the perpetrator act for personal benefit or to deprive the other person of something," but "[t]hat something need not be money." *United States v. Barber*, 39 F.3d 285, 288 (10th Cir. 1994); *see also United States v. Goldsmith*, 68 F.2d 5, 7 (2d Cir. 1933) (discussing 18 U.S.C. § 72 and stating that "[i]t is clearly established that, to defraud the United States, pecuniary loss is not necessary; any impairment of the administration of its governmental functions will suffice").

We need not provide a further definition of the term "intent . . . to defraud," however, as there was sufficient evidence to

prove that Luke's conduct fit within any reasonable definition of the term. Both the Philadelphia and Catonsville applications asserted that the applicants wanted passports to enable them to travel outside the United States. The Philadelphia application was more particular: the applicant there sought a passport in order to travel to Nigeria in December of 2007. Luke confirmed that statement of purpose during his meeting with Michael Persons, the fraud prevention manager at the U.S. Passport Agency in Philadelphia. Indeed, at trial, Persons testified that Luke told him that he was seeking a passport to allow Luke's "son" (the man masquerading as Jonathan Osuagwu) to travel to Nigeria. There was also weighty circumstantial evidence on this point as well: Luke's passport revealed that he himself traveled to Nigeria in December 2007, and a receipt uncovered during the search of his home established that he had purchased travel for Jonathan Osuagwu.

This evidence was more than enough to establish Luke's intent to defraud. While Luke argues that the district court merely "speculat[ed]" as to what he or his coconspirators might do with the passport, there was sufficient evidence to turn any speculation into fact: they planned to use the passports to travel. That use would "defraud" the United States. 18 U.S.C. § 1028(a)(4). After all, using a fraudulently obtained passport "obstruct[s] functions of the government," namely the government's duty to police entry and exit from the country. *See* H.R. Rep. 97-802, at 11. Traveling under a false passport is also a federal crime. *See* 18 U.S.C. § 1543 (punishing any person who "willfully and knowingly uses, or attempts to use, or furnishes to another for use any such false, forged, counterfeited, mutilated, or altered passport or instrument purporting to be a passport"); 18 U.S.C. § 1544 (punishing anyone who "willfully and knowingly uses, or attempts to use, any passport issued or designed for the use of another" or "willfully and knowingly furnishes, disposes of, or delivers a passport to any person, for use by another than the person for whose use it was originally issued and designed"). A person

who possesses a passport for any of these criminal uses plainly possesses an "intent . . . to defraud" the United States under § 1028(a)(4).

Moreover, Luke conspired to violate § 1028(a)(4) in yet another way: by possessing the Social Security and Selective Service cards issued to Jonathan Osuagwu with the intent to defraud the United States by submitting those documents in support of a fraudulent passport application. We have previously held that "Social Security cards are identification documents" under 18 U.S.C. § 1028(d), *see United States v. Quinteros*, 769 F.2d 968, 969-70 (4th Cir. 1985), and the same logic applies to Selective Service cards. Indeed, it is difficult to think of any reason for Luke to have submitted the Osuagwu Selective Service card along with the Philadelphia application if not as further proof of Osuagwu's identity. *See* 18 U.S.C. § 1028(d)(3) (defining "identification document[s]" as being "of a type intended or commonly accepted for the purpose of identification of individuals"); *Quinteros*, 769 F.2d at 969-70.

It is undisputed that Luke submitted the Social Security and Selective Service cards along with the Philadelphia application in order to obtain a passport for someone pretending to be Jonathan Osuagwu. In submitting those cards, however, Luke defrauded the United States by attempting to induce the creation of a false passport. Indeed, obtaining a passport by submitting fraudulent documents would constitute an offense against the United States. *See* 18 U.S.C. § 1542 (punishing anyone who "willfully and knowingly makes any false statement in an application for passport with intent to induce or secure the issuance of a passport under the authority of the United States, either for his own use or the use of another"); *see also Goldsmith v. United States*, 42 F.2d 133, 134-35 (2d Cir. 1930) (affirming conviction for submitting a counterfeit "writing" to a consular official "for the purpose of defrauding the United States" where the defendant submitted a forged letter in support of his visa application).

In response to this argument, Luke makes the odd assertion that he did not intend to defraud the government with the Osuagwu documents because he never used his son Jonathan Lilly's actual identifying information. This hardly helps. The evidence established that Luke changed his son's name to Jonathan Osuagwu for a short period of time in order to obtain identification documents in that name. Luke then possessed those documents with the intent to submit them in support of a fraudulent passport application by an unknown third party. The fact that Luke used now-invalid identifying documents to support a fraudulent passport application does not make his conduct less worthy of condemnation than if he had used real documents to support the same illegal goals. The evidence thus established that Luke's state of mind fell within the ambit of the term "intent . . . to defraud" in § 1028(a)(4), meaning that his conviction under § 1028(f) must stand.[3]

IV.

Luke's final argument is that his conviction on count four (aggravated identity theft under 18 U.S.C. § 1028A) must fall. That statute imposes a two-year prison sentence for any person who, "during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." 18 U.S.C. § 1028A(a)(1). Subsection (c), in

_____

[3]Luke may be correct that the government could have charged him under different provisions, namely 18 U.S.C. § 1542, which punishes anyone who makes false statements in the application or use of a passport, and 18 U.S.C. § 1028(a)(7), which punishes anyone who "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law." But the fact that other statutory provisions might cover Luke's conduct does not mean that his conduct is outside the ambit of §§ 1028(a)(2) and (a)(4). At its core, Luke's argument amounts to little more than a request for us to second-guess the prosecutor's charging decisions. We decline that invitation.

turn, includes within its scope violations of § 1028(f) that are predicated upon acts covered by §§ 1028(a)(2) and (a)(4). 18 U.S.C. § 1028A(c)(4). Luke's first contention is that his conviction on count four should be vacated because his § 1028A conviction is predicated upon his infirm § 1028(f) conviction. But because we affirm Luke's § 1028(f) conviction, we will not disturb his § 1028A conviction on that ground.

Luke's only other argument stems from the fact that § 1028A(c) excludes violations of "section 1028(a)(7)" from 1028A's scope. *See* 18 U.S.C. § 1028A(c)(4). According to Luke, his conduct *could* fall within the scope of § 1028(a)(7), meaning that his conviction under § 1028A cannot stand. But while Luke is right that his conduct might be punishable under § 1028(a)(7), the fact remains that he was not actually charged or convicted under that provision. His "felony violation" for purposes of § 1028A was his conviction under § 1028(f), and that provision – like §§ 1028(a)(2) and (a)(4) – is not excluded from § 1028A's scope. In other words, § 1028A does not speak in terms of hypothetical offenses, but instead looks to the actual underlying offense of conviction. Because Luke's § 1028(a)(7) argument is premised on such a hypothetical, it cannot withstand scrutiny.

## V.

All of Luke's arguments can be boiled down to one basic source: his attempt to read 18 U.S.C. § 1028 as restrictively as possible. But Congress enacted the statute to stem the prevalent use of false identification documents in facilitating dangerous and destructive crimes. Luke committed all sorts of fraud against the government, and the acts he conspired to commit fall precisely within the parameters of §§ 1028(a)(2) and (a)(4). To read the provisions as Luke wishes would quite simply emasculate the intent of the body that passed them. Because Luke's challenges are without merit, the judgment of the district court is hereby affirmed.

*AFFIRMED*