**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 21, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

HUMPHREY EZEKIEL ETENYI,

    Defendant - Appellant.

No. 16-3364
(D.C. No. 6:15-CR-10102-JTM-1)
(D. Kansas)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

A jury convicted Humphrey Ezekiel Etenyi of unlawfully producing an identification document, aggravated identity theft, and hindering deportation from the United States. Mr. Etenyi appeals all three convictions. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

### A.  *Factual History*

Mr. Etenyi was born and raised in Kenya. He arrived in the United States on a non-immigrant student visa in 2006 to attend Wichita State University, from which

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

he graduated in 2011 with a degree in international business. Wishing to stay in America, Mr. Etenyi began putting down roots. He bought a house in Wichita, earned an advanced degree in healthcare leadership from Friends University, and applied for a change of status to become a permanent resident. In the course of investigating that change of status request, the government discovered a 2009 employment form which appeared to show that Mr. Etenyi, under penalty of perjury, attested that he was a citizen of the United States and eligible to work on that basis. As a result, his application was denied. And, in 2012, he was placed in removal proceedings for violating the terms of his student visa and for making a false claim of United States citizenship. In August 2013, an immigration judge found Mr. Etenyi deportable. Mr. Etenyi filed an appeal, which was denied in September 2014. He moved for reconsideration, but that motion too was denied, thus exhausting Mr. Etenyi's administrative appeals and subjecting him to immediate removal from the United States as of February 9, 2015.

Meanwhile, on January 15, 2015, Mr. Etenyi walked into an office of the Kansas Department of Revenue ("KDOR") with his brother's employment identification card and walked out with a temporary paper Kansas driver's license (the "Driver's License") bearing Mr. Etenyi's photograph but his brother's name, apparent signature, date of birth, address, and license number. Mr. Etenyi and his

brother, Samson Etenyi Sievisa,[1] contend this was an honest mistake. Mr. Sievisa, a permanent resident of the United States, testified at trial that he received a temporary Kansas driver's license in early December 2014, with the expectation that he would receive a permanent plastic license in the mail within two to three weeks. After the card did not arrive within the expected timeframe, Mr. Sievisa lent Mr. Etenyi his Employment Authorization Card and asked him to "give me a favor and go get the driver's license for me." 2 ROA 306–07. Mr. Etenyi testified likewise. He says that he went to a driver's license station in Twin Lakes on Mr. Sievisa's behalf and announced, "I'm here to pick up a driver's license for my brother." *Id.* at 333. At trial, Mr. Etenyi described what happened next:

> And then they started putting stuff in the computer and then she told me, Back up, and then I backed up and then she took a picture. First, I was like, I didn't understand but I thought maybe because a new system so I stood there and then she took a picture and then she said, Can you turn head like this and then I—I was like—I stood there, and then she took a picture and then when I went closer she put stuff in the computer and then she just says $18.

*Id.* at 334. Mr. Etenyi testified that he paid ($27, though he is not sure why the price went up) "and then she just pulled a receipt . . . and then I just took it and put it in a pocket and then left." *Id.* at 335. On cross examination, Mr. Etenyi clarified that he did not even look at the receipt handed him—he just folded it up and put it in his pocket, because "[t]hat is what I normally do [with] my receipts." *Id.* at 370. Mr. Etenyi further testified that he does not remember whether he signed any document—

---

[1] Although Mr. Etenyi and Mr. Sievisa are brothers, Mr. Sievisa has used "Etenyi" as his middle name and "Sievisa" as his surname ever since he mixed them up on an application for a Kenyan ID in 2004.

whether in his own name or his brother's name—but he believes he did not. He also testified that he does not remember whether the clerk checked his vision.[2]

On February 10, 2015, the day after Mr. Etenyi's reconsideration motion was denied, immigration officers knocked on his front door and arrested him so as to effect his removal. Incident to the arrest, officers found the aforementioned Driver's License folded in Mr. Etenyi's wallet.[3] In the ensuing months, the government attempted to remove Mr. Etenyi to Kenya. But no one could find his passport. On the day of his arrest, Mr. Etenyi speculated that his brother might have it, but he was not sure, and he declined to give the officers permission to search his house. Over the next several months, Mr. Etenyi variously told officers he did not know where his passport was, that it was at his house and no one should retrieve it, that his brother had it, and that it could have been stolen in a burglary. Immigration officers obtained a warrant in May 2015 and searched Mr. Etenyi's house for the passport. They did not find it, but the search did reveal a certified copy of the passport along with a

---

[2] The KDOR driver's license examiner who assisted Mr. Etenyi that day was Jillian Wallace. Ms. Wallace does not recall the events of January 15, 2015, but she testified that she always asks nine questions before processing a driver's license application, including whether the applicant has any disabilities that could make it difficult to safely operate a motor vehicle and whether the applicant has suffered a seizure in the last six months. Ms. Wallace testified that she will not issue a driver's license absent satisfactory answers to her questions.

[3] That discovery was not necessarily a surprise. According to the government, the KDOR had already informed the Department of Homeland Security that Mr. Etenyi appeared to have obtained a temporary Kansas driver's license using his brother's identity.

receipt showing that Mr. Etenyi had renewed his passport in March 2010, making it valid until October 2015.

From February 2015 to July 2015, immigration officers served Mr. Etenyi with three separate Form I-229(a) Warnings for Failure to Depart. These forms notified Mr. Etenyi that he was subject to a final order of removal and that his willful failure to assist in the removal was a crime. On May 11, immigration officers served Mr. Etenyi with a warning that he must comply with all requirements for his removal. And on May 27, they served him with a Failure to Comply stating that he was not in compliance with the requirement to aid in his removal. Mr. Etenyi refused to sign any statements acknowledging receipt of any of these documents.

Immigration officers arranged a call between themselves, Mr. Etenyi, and his attorney to address his missing passport, but Mr. Etenyi did not cooperate. Immigration officers also called the Kenyan consulate in Los Angeles in an attempt to secure documentation that would make his removal possible. But Mr. Etenyi refused to say anything to the consulate official once he was on the phone.

## B. *Procedural History*

In July 2015, a federal grand jury returned a five-count indictment against Mr. Etenyi. Count 1 charged him with knowingly and intentionally possessing and using Mr. Sievisa's Employment Authorization Card, in violation of 18 U.S.C. § 1546(a) and 2. Count 2 charged Mr. Etenyi with unlawfully producing and aiding and abetting the production of an identification document issued by the State of Kansas, in violation of 18 U.S.C. § 1028(a)(1) and 2. Count 3 charged Mr. Etenyi with

5

aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). Count 4 charged Mr. Etenyi with knowingly and intentionally taking action with the purpose of preventing or hampering his departure from the United States, in that he will not make available the identification documents necessary for his removal, such as his Kenyan passport, in violation of 18 U.S.C. § 1253(a)(1)(C). And Count 5 charged him with knowingly, willfully, and intentionally making materially false, fictitious, and fraudulent statements and representations, in that he alternatively claimed to deportation officers that his Kenyan passport was at his brother's residence, that it was at his own residence, and that it might have been stolen during a burglary of his residence, in violation of 18 U.S.C. § 1001(a)(2).

The government voluntarily dismissed Count 1, but the remainder of the charges went to trial in September 2016. A jury convicted Mr. Etenyi of Counts 2, 3, and 4, but acquitted him of Count 5. After trial, the district court denied Mr. Etenyi's motions seeking dismissal of the charges and for a new trial or judgment notwithstanding the verdict. *United States v. Etenyi*, No. 15-10102-JTM, 2016 WL 6462037, at *1–4 (D. Kan. Nov. 1, 2016). It sentenced him to twenty-seven months' imprisonment, time that Mr. Etenyi has since served. As of the date of oral argument in this case, Mr. Etenyi was expected to be deported to Kenya within thirty days.[4]

---

[4] These facts—that Mr. Etenyi has served his sentence and has been or will soon be deported to Kenya—raise a potential mootness issue. Although the government did not argue mootness, we must nevertheless address it "because it goes to our appellate jurisdiction." *United States v. Reider*, 103 F.3d 99, 101 (10th Cir. 1996). In *Reider*, we held that "[a] defendant's release from custody upon the expiration of a sentence does not moot an appeal from the conviction if there is a

6

## II.    DISCUSSION

This court reviews a district court's denial of a motion to dismiss a criminal indictment for abuse of discretion, but reviews any statutory interpretation issues de novo. *United States v. Berres*, 777 F.3d 1083, 1089 (10th Cir. 2015). We also review de novo sufficiency of evidence claims and denials of motions for judgments of acquittal. *United States v. Porter*, 745 F.3d 1035, 1050 (10th Cir. 2014). "In doing so, we must examine whether, viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *Id*. (internal quotation marks omitted). "We do not weigh conflicting evidence or consider witness credibility, and the fact that prosecution and defense witnesses presented conflicting or differing accounts at trial does not necessarily render the evidence insufficient." *Id*. (citation omitted).

We now turn to Mr. Etenyi's arguments for reversal as to each of his three convictions. For the reasons explained below, we affirm on all counts.

### A. *Unlawful Production of Identification Document*

The jury convicted Mr. Etenyi of producing a state-issued identification document without lawful authority, in violation of 18 U.S.C. § 1028(a)(1). In relevant part, § 1028(a)(1) prohibits a person from "knowingly and without lawful

---

possibility that the defendant may suffer collateral legal consequences from a sentence already served." *Id.* (internal quotation marks omitted). In this case, collateral legal consequences appear less likely once Mr. Etenyi is deported. But they are possible, as his prior convictions would be salient if, for instance, Mr. Etenyi attempts to reenter the United States or if he is charged with another crime in the United States. We thus conclude this appeal is not moot.

authority produc[ing] an identification document." The statute defines "produce" to include "alter, authenticate, or assemble," 18 U.S.C. § 1028(d)(9), and "identification document" as a "document made or issued by or under the authority of . . . a State . . . which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals," *id.* § 1028(d)(3). Although § 1028(a)(1) is silent as to accessory liability, it is modified by 18 U.S.C. § 2, which provides that:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

*See United States v. Rashwan*, 328 F.3d 160, 165 (4th Cir. 2003) ("Section 2 merely obviates the need for awkward phrasing and strained readings of statutes by making clear that in all crimes an accessory will be punished as a principal."); *United States v. Scroger*, 98 F.3d 1256, 1262 (10th Cir. 1996) (noting that Section 2 "abolishes the common-law distinction between principal and accessory"); *United States v. Dodd*, 43 F.3d 759, 762 n.5 (1st Cir. 1995) (noting that an aider and abettor charge "is implicit in all indictments").

Mr. Etenyi's primary argument for reversal is twofold. First, he argues he did not "produce" the Driver's License, because it was produced by the KDOR, not him. Second, he argues he cannot be guilty of aiding and abetting the production of the Driver's License because the principal—here, the KDOR, or one or more of its

8

employees—is innocent of any crime. The district court was not persuaded by Mr. Etenyi's first argument, noting that "production" as used in § 1028(a)(1) "is not narrow, and by ordinary construction would include 'to cause to be produced.'" *Etenyi*, 2016 WL 6462037, at *1. It also observed that the Driver's License was produced only after "someone" (i.e., Mr. Etenyi) "agreed to the questions posed by the examiner—that is, helped to authenticate it," *id.*, which the statute tells us is within the definition of "produce," § 1028(d)(9). The district court then held that substantial evidence supported the jury's conclusion that Mr. Etenyi aided and abetted the production of the Driver's License. *Etenyi*, 2016 WL 6462037, at *1. In so holding, the district court relied on three out-of-circuit cases for the proposition that a defendant may violate § 1028 by helping to cause a government clerk or other third person to issue a false identification. *See id.* (citing *United States v. Jaensch*, 665 F.3d 83, 95 (4th Cir. 2011); *Rashwan*, 328 F.3d 160; *United States v. Ruffin*, 613 F.2d 408, 412 (2d Cir. 1979)).

We agree the evidence was sufficient to convict Mr. Etenyi both of producing the Driver's License and of aiding and abetting its production. *See United States v. Cueto*, 628 F.2d 1273, 1275 (10th Cir. 1980) (affirming where "the record amply supports a conviction regardless of whether the jury believed [the defendant] to be guilty as the principal or as an aider and abettor"). This court has already held that a principal's innocence is no defense. *See United States v. DeSantiago-Flores*, 107 F.3d 1472, 1478 (10th Cir. 1997) ("[W]here as here culpability is based in § 2(b), an individual is criminally culpable when an intermediary is used to commit a criminal

9

act, even though that intermediary has no criminal intent and is innocent of the substantive crime."), *overruled on other grounds by United States v. Holland*, 116 F.3d 1353 (10th Cir. 1997). And the Fourth Circuit has held that a defendant may violate § 1028(a) by causing an innocent government clerk to issue a false identification. *See United States v. Luke*, 628 F.3d 114, 118–19 (4th Cir. 2010); *Rashwan*, 328 F.3d at 165 (holding that the defendant "cannot insulate himself from punishment by manipulating innocent third parties to perform acts on his behalf that would be illegal if he performed them himself").

*Rashwan* is on point. In that case, the defendant argued that he was improperly prosecuted under § 1028(a)(1) for obtaining a false driver's license because he did not produce the driver's license himself; rather, it was produced by the Virginia Department of Motor Vehicles. 328 F.3d at 162, 165. Relying on 18 U.S.C. § 2(b) and Tenth Circuit case law, *see id.* at 165 (citing *Scroger*, 98 F.3d at 1262), the Fourth Circuit held that the defendant "aided and abetted the production of false identification documents by providing false information to the DMV with the specific intent that the agency would then produce a false identification document for him," *id.* Because of the defendant's specific intent, it was irrelevant "whether the clerk who actually produced the license also had any intent to commit the crime." *Id.* (citing *Ruffin*, 613 F.2d at 412).

In his brief, Mr. Etenyi urges us not to follow *Rashwan*, *Jaensch*, and other cases in accord because they are "flawed" and do not comport with established

10

Supreme Court and Tenth Circuit law.[5] At oral argument, counsel for Mr. Etenyi again criticized the Fourth Circuit's "tortured reading of aid and abet theory," adding that he "can't say it any nicer than that." But Mr. Etenyi has not identified a single Supreme Court or Tenth Circuit case inconsistent with *Rashwan*. He relies principally on *Shuttlesworth v. City of Birmingham*, 373 U.S. 262, 265 (1963), in which the Supreme Court said "[i]t is generally recognized that there can be no conviction for aiding and abetting someone to do an innocent act." In that case, two ministers were convicted for aiding and abetting a violation of Birmingham's criminal trespass ordinance. *Id.* at 263. The same day *Shuttlesworth* was decided, the Court reversed the underlying trespass convictions. *See Gober v. City of Birmingham*, 373 U.S. 374 (1963). Having set aside the underlying convictions, it followed that the ministers did

---

[5] Although Mr. Etenyi does not argue the point, we note *Rashwan* and *DeSantiago-Flores* both relied on 18 U.S.C. § 2(b), *see Rashwan*, 328 F.3d at 165; *DeSantiago-Flores*, 107 F.3d at 1478, while the jury in this case was instructed only on 18 U.S.C. § 2(a). Some out-of-circuit cases suggest this may be a salient difference. *See, e.g.*, *United States v. Hornaday*, 392 F.3d 1306, 1313 (11th Cir. 2004) ("The argument that someone else has to commit an offense for [§ 2(a)] to fit is a forceful one," but "[t]he same cannot be said" for § 2(b), which "is obviously designed for[] the situation in which a defendant with the requisite intent to commit a crime gets someone else to act in a way necessary to bring about the crime, even if that other person is innocent."); *United States v. Ruffin*, 613 F.2d 408, 412 (2d Cir. 1979) (holding that a defendant can be found guilty under § 2(a)—but not § 2(b)— where the defendant's intermediary is innocent of the predicate crime). But, even assuming the district court erred in instructing the jury under § 2(a) only, that error does not undermine Mr. Etenyi's conviction. Recall that Mr. Etenyi was indicted under § 2, generally, and, even if he was not, "a violation of 18 U.S.C. § 2(b) is implicit in every charge." *United States v. Dunne*, 324 F.3d 1158, 1159 (10th Cir. 2003). Because the evidence was sufficient to convict Mr. Etenyi under § 2(b), the district court's decision to instruct the jury on § 2(a) alone does not trouble us. To the extent the court erred by omitting a § 2(b) instruction, that error inured to Mr. Etenyi's benefit, not the government's.

11

not incite or aid and abet any crime, and thus their aid-and-abet convictions were reversed as well. *Shuttlesworth*, 373 U.S. at 265. *Shuttlesworth* thus stands for the proposition that one cannot be convicted for aiding and abetting acts that are not criminal. It is not in tension with the principle that a person "cannot insulate himself from punishment by manipulating innocent third parties to perform acts on his behalf that would be illegal if he performed them himself." *See Rashwan*, 328 F.3d at 165; *see also United States v. Standefer*, 610 F.2d 1076, 1087–88 (3d Cir. 1979) (en banc) (distinguishing *Shuttlesworth* on the basis that "[t]he crime charged here is not constitutionally protected or otherwise innocent activity"), *aff'd*, 447 U.S. 10 (1980).

To be sure, Mr. Etenyi's aid-and-abet argument is that the evidence was insufficient to convict him on his (mistaken) theory of aid and abet, which requires proof of the principal's guilty mind. On this point, he may well be right, as there was no evidence presented that anyone at the KDOR committed a crime. In language friendly to Mr. Etenyi's view of the law, the trial judge instructed the jury that 18 U.S.C. § 2 "makes it a crime to intentionally help someone else commit a crime. To find a defendant guilty of this crime, you must be convinced that the government has proved . . . someone else committed the charged crime[.]" 1 ROA 57. To the extent this instruction required the jury to find that a KDOR employee or anyone else other than Mr. Etenyi committed a crime as an essential element to convict Mr. Etenyi, it was a misstatement of the law. But because that error would clearly inure to Mr. Etenyi's benefit, it was harmless. More to the point, that error need not—indeed, should not—be repeated when evaluating the sufficiency of the evidence on appeal.

12

*See Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) ("[W]hen a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element, a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction.").

Finally, Mr. Etenyi argues that because the words "aid or abet" are found in 18 U.S.C. § 1028(a)(7), but not § 1028(a)(1), "aiding and abetting" cannot apply to § 1028(a)(1). As we have already explained, however, the charge of aiding and abetting is inherent in any crime. *See United States v. Cooper*, 375 F.3d 1041, 1049 (10th Cir. 2004) ("[I]t is well established that aiding and abetting is not an independent crime under 18 U.S.C. § 2; it simply abolishes the common-law distinction between principal and accessory."); *Scroger*, 98 F.3d at 1262; *Dodd*, 43 F.3d at 762 n.5. Section 1028(a)(1) is no exception. *See Rashwan*, 328 F.3d at 165; *cf. United States v. Hai Gan*, 641 F. App'x 833, 835 (10th Cir. 2016) (affirming conviction for aiding and abetting a violation of § 1028(a)(2)). We affirm Mr. Etenyi's conviction under § 1028(a)(1).

## B. *Aggravated Identity Theft*

The jury also convicted Mr. Etenyi of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). Mr. Etenyi argues that the aggravated identity theft conviction should be reversed for the same reasons as the unlawful production conviction, because it is multiplicitous of that conviction, and because the evidence did not establish that he acted "without lawful authority." Because we affirm his

13

conviction under § 1028(a)(1), Mr. Etenyi's first argument necessarily fails. *See Luke*, 628 F.3d at 122–23.

As to the second argument, Mr. Etenyi contends the § 1028(a)(1) and § 1028A(a)(1) charges are multiplicitous because they are based on the same conduct. "Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior." *United States v. Johnson*, 130 F.3d 1420, 1424 (10th Cir. 1997). While not fatal to an indictment, multiplicity "poses the threat of multiple sentences for the same offense," *United States v. Morehead*, 959 F.2d 1489, 1505 (10th Cir.), *on reh'g sub nom. United States v. Hill*, 971 F.2d 1461 (10th Cir. 1992), thus implicating the Fifth Amendment's prohibition on double jeopardy, *see* U.S. Const. amend. V ("No person shall be . . . subject for the same offence to be twice put in jeopardy of life or limb[.]"). As a result, a defendant may not be punished "for the same conduct under 'two distinct statutory provisions' unless 'each provision requires proof of a fact which the other does not.'" *United States v. Rentz*, 777 F.3d 1105, 1108 (10th Cir. 2015) (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

Count 3 charged Mr. Etenyi with aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). The statute reads:

> Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

14

By cross-referencing subsection (c), the statute makes clear that a violation of 18 U.S.C. § 1028(a)(1) counts as a predicate offense. *See* 18 U.S.C. § 1028A(c)(4) (defining "felony violation enumerated in subsection (c)" to include "any provision contained in this chapter . . . other than this section or section 1028(a)(7)"). "Means of identification," as defined by statute, include "any name or number that may be used" to identify a specific individual, including any name, social security number, date of birth, official State or government issued driver's license, or employment identification number. 18 U.S.C. § 1028(d)(7)(A).

Mr. Etenyi's multiplicity argument rings hollow. The jury instructions for Counts 2 and 3 outlined how the elements of § 1028(a)(1) differ from the elements of § 1028A(a)(1). The jury instructions for Count 2 state that § 1028(a)(1) requires the government to prove (1) "the defendant knowingly and intentionally produced and aided and abetted the production of an identification document," (2) "he did so without lawful authority, meaning it was unlawful for him to do so," and (3) "the production of the identification document was in or affected interstate commerce." 1 ROA 53. On the other hand, the jury instructions for Count 3 state that § 1028A(a)(1) requires the government to prove (1) "the defendant knowingly and intentionally used a means of identification he knew to be of another person," (2) "the defendant used the means of identification without lawful authority, meaning he used it for an unlawful purpose," and (3) "the defendant used the means of identification during and in relation to the crime alleged in Count 2." *Id.* at 54. Thus, Count 2 required proof that Mr. Etenyi produced an identification document. Count 3

15

did not. Count 3 required proof that Mr. Etenyi used a means of identification of another person. Count 2 did not. Therefore, the charges are not multiplicitous.

Next, we consider Mr. Etenyi's argument that the evidence was insufficient to establish that he acted "without lawful authority." In support, Mr. Etenyi relies on uncontroverted trial testimony establishing that Mr. Sievisa willingly gave Mr. Etenyi his employment authorization card. Thus, Mr. Etenyi contends, it was "impossible" for him to unlawfully possess his brother's employment authorization card, and so he should not have been convicted. There are at least two problems with this argument. First, it rests on a faulty premise made explicit in Mr. Etenyi's opening brief, in which he "contends that the phrase 'without lawful authority,' at least as charged in this Indictment, necessarily referred to Mr. Etenyi's 'possession' of the card." Aplt. Br. 33. But the indictment alleges that Mr. Etenyi violated § 1028A(a)(1) when he "knowingly and intentionally used and possessed, without lawful authority, a means of identification [he] knew to be of another person during and in relation to a violation of . . . [18 U.S.C. § 1028(a)(1)], unlawful production of an identity document, as alleged in Count 2." 1 ROA 43. Nothing in the indictment limits the government's ability to prove its case by reference to any "means of identification" identified at § 1028(d)(7)(A), which include not only an employment identification number but also any name, social security number, date of birth, or official State or government issued driver's license. That list does not purport to be exhaustive. And the jury could have reasonably found from the evidence presented that Mr. Etenyi provided his brother's name, date of birth, and even his purported signature, to obtain

16

the Driver's License. *See Porter*, 745 F.3d at 1040 (holding that "a signature is a form of a 'name'" within the meaning of § 1028(d)(7)). Second, and more fundamental, the fact that Mr. Etenyi had Mr. Sievisa's consent to use his employment authorization card does not suffice to establish that his use and possession of that document was lawful. Mr. Sievisa plainly does not possess that authority.

### C. *Hindering Deportation*

Finally, the jury convicted Mr. Etenyi of preventing or hampering deportation from the United States, in violation of 8 U.S.C. § 1253(a)(1)(C). On appeal, Mr. Etenyi takes issue with both the sufficiency of the evidence and the jury instruction. Neither argument has merit.

### 1.    Sufficiency of the Evidence

Mr. Etenyi argues that the evidence is insufficient because he "was in jail during the entire period of time applicable to this charge" and therefore "any intentional 'preventing or hampering' of his departure was largely within the control or direction of the Federal Government." Aplt. Br. 36. To convict, the jury need only have found that Mr. Etenyi "connive[d] or conspire[d], or t[ook] *any other action*, designed to prevent or hamper or with the purpose of preventing or hampering" his removal. 8 U.S.C. § 1253(a)(1)(C) (emphasis added). Our review of the record confirms that the government presented ample evidence demonstrating Mr. Etenyi's obstinacy while in custody, which the jury was free to accept and which we are bound to view in a light most favorable to the government. For instance, the jury

17

could have reasonably determined that Mr. Etenyi's failure to produce his passport, along with his inconsistent statements about where the passport might be, were an attempt to delay or hamper deportation. Or it could reasonably determine that Mr. Etenyi's refusal to speak with the Kenyan consulate when immigration officials arranged a phone call was an attempt to delay or hamper his removal. Mr. Etenyi's alternative narrative, while perhaps plausible, is not so compelling that a reasonable jury would have no choice but to accept it. *See Porter*, 745 F.3d at 1050 ("We do not weigh conflicting evidence or consider witness credibility, and the fact that prosecution and defense witnesses presented conflicting or differing accounts at trial does not necessarily render the evidence insufficient.") (citation omitted).

## 2. Jury Instruction

Mr. Etenyi also argues that the district court's jury instruction "did not accurately follow the allegation in the Indictment." Aplt. Br. 45. We review jury instructions de novo, examining them "in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case." *United States v. Kalu*, 791 F.3d 1194, 1200–01 (10th Cir. 2015) (citation omitted). In relevant part, the district court instructed the jury as follows:

> The defendant is charged in Count 4 of violating Title 8, United States Code, Section 1253(a)(1)(C). This law makes it a crime to knowingly and intentionally impede one's lawful removal from the United States.

> To find the defendant guilty of this crime the United States must prove beyond a reasonable doubt that:

18

> *First,* a final order of removal was outstanding against the defendant.
>
> *Second,* the defendant was deportable pursuant to U.S. immigration laws.
>
> *Third,* the defendant knowingly and intentionally connived or conspired, or took any action, to prevent or hamper, or with the purpose of preventing or hampering, his departure from the United States.
>
> For the defendant to have acted knowingly and intentionally, the government must prove that the defendant acted in such a way as to prevent or hamper his departure and that he intended his actions to have that effect.

1 ROA 55. As an initial matter, the court's instruction is undoubtedly faithful to the statutory text, *see* 8 U.S.C. § 1253(a)(1)(C), and Mr. Etenyi does not appear to argue otherwise. He argues instead that the instruction impermissibly departs from the indictment, which alleged that Mr. Etenyi violated § 1253(a)(1)(C) "in that he will not make available the identification documents necessary for his removal, such as his Kenyan passport." 1 ROA 15. Mr. Etenyi contends the district court's failure to include that language in the jury instruction "creates a variance or constructive amendment," meaning the indictment was effectively amended such that Mr. Etenyi was convicted of an offense "different than what he understood he was being charged with." Aplt. Br. 47–48. We are not persuaded.

"A constructive amendment results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the

19

indictment." *United States v. Edwards*, 782 F.3d 554, 561 (10th Cir. 2015) (citation omitted). "When a constructive amendment is established, it constitutes reversible error per se." *United States v. Apodaca*, 843 F.2d 421, 428 (10th Cir. 1988).

As described *supra*, the evidence presented at trial was sufficient for the jury to find that Mr. Etenyi acted with the purpose of preventing or hampering his departure, in that he failed to produce his passport, gave inconsistent statements about where the passport might be, and refused to speak with the Kenyan consulate, which immigration officers asked that he do for the purpose of securing identification documents to effectuate his removal. We have no reason to believe the jury instruction yielded a conviction on a theory different than that alleged in the indictment, let alone a "substantial likelihood" this was the case. *See Edwards*, 782 F.3d at 561.

The cases relied on by Mr. Etenyi do not give us pause; he cites *Edwards* and *United States v. Smith*, 838 F.2d 436 (10th Cir. 1988), the latter for the proposition that a criminal defendant should only be tried on an indictment as found by the grand jury "and this should include all language in the charging part of that document." Aplt. Br. 47. In both *Edwards* and *Smith*, this court *affirmed* the defendant's conviction. *See Edwards*, 782 F.3d at 565; *Smith*, 838 F.2d at 441. Moreover, in *Smith*, we stressed that "proof is not required of everything alleged in the indictment." 838 F.2d at 439. Where, as here, the indictment includes allegations that are not essential elements of the offense, such allegations are "merely surplusage and the prosecution d[oes] not have to prove them." *See id.* at 440. The district court

20

properly instructed the jury on the essential elements of the § 1253(a)(1)(C) charge. It was not obliged to repeat superfluous language from the indictment in its instruction to the jury. *See Rashwan*, 328 F.3d at 165 ("[T]he precise language used in the indictment, by the prosecution, or in the jury instructions is unimportant. So long as all of the elements necessary to find [the defendant] guilty of the crime . . . were put before the jury, conviction will be proper.").

## III.   CONCLUSION

For the foregoing reasons, we AFFIRM Mr. Etenyi's convictions and uphold the district court's resulting judgment.

Entered for the Court


Carolyn B. McHugh
Circuit Judge

21